quirements of confrontation and cross-examination.

The government argues that we should not decide in favor of Mr. Doty in order to "punish" the agency for its procedural violations. We agree that this is a separate consideration, and we review the merits to determine whether, on the grounds on which the agency relied for the action that it took, the agency action constituted arbitrary or capricious conduct, or was an abuse of the agency's discretionary authority, or violated an applicable statute or regulation.

### B. Substance

On the merits of Doty's claim, it remains undisputed that the only evidence against Doty was the unsworn, unsigned, and uncorroborated statement of Siekmann. In this appeal the government continues to refer to the statement of Siekmann as the factual basis for its position. That statement was correctly excluded by the Court of Federal Claims, for every aspect thereof was contradicted by the consistent testimony of witnesses, of quality and weight as to thoroughly impeach the unsworn statement of Siekmann. Siekmann himself admitted that he lied in two successive statements, and he did not sign his third statement. There was no other evidence against Doty, and a good deal of evidence supporting Doty. The Court of Federal Claims found that there were "four disinterested sources of evidence (James St. Aubin, Lawrence St. Aubin, Christianson, and Gniffke) before the State Committee, which refuted the accuracy of Siekmann's written statement and which supported Doty's position and Siekmann's first (oral) statement." *Doty v. United States*, 24 Cl.Ct. 615, 621–22 (1991).

No discrepancies were found during the ASCS inspection by Gniffke, and it is not disputed that Doty's herd was destroyed, in accordance with the verified count. We do not know whether the two branded cattle were switched by Siekmann, as Doty speculates. The government argues that all factual inferences must be drawn against Doty. However, inferences must have an evidentiary basis. On the record as a whole, the agency's conclusion that Doty acted in bad faith and violated his contract was arbitrary and capricious, in that the only evidence on which the agency relied was not properly before it. *See National R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 419–21, 112 S.Ct. 1394, 1403, 118 L.Ed.2d 52 (1992) ("an agency's action may not be upheld on grounds other than those relied on by the agency"); *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (same). Thus the Court of Federal Claims erred in sustaining the agency's action. The court's decision is reversed. It is ordered that the contract price of $99,841.96 shall be paid to Doty, with interest in accordance with law.

### C. The Civil Penalty

The Court of Federal Claims vacated the additional $10,000 penalty against Doty. For the reasons discussed in Parts A and B, this decision is affirmed.

### Costs

Taxable costs to Doty.

*AFFIRMED IN PART AND REVERSED IN PART.*

COWEN, Senior Circuit Judge, concurs in the result.

**CORE–VENT CORPORATION,**
Plaintiff–Appellee,

v.

**IMPLANT INNOVATIONS, INC.,**
Defendant–Appellant.

No. 94–1330.

United States Court of Appeals,
Federal Circuit.

April 20, 1995.

Patrick F. Bright, Bright & Lorig, P.C., Los Angeles, CA, argued for plaintiff-appellee.

Edward L. Foote, Winston & Strawn, Chicago, IL, argued for defendant-appellant. With him on brief was Peter C. McCabe, III. Also on brief were Todd B. Serota and Brian W. Kasell, Brobeck, Phleger & Harrison, Los Angeles, CA.

Before MICHEL and CLEVENGER, Circuit Judges, and FRIEDMAN, Senior Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The question is whether, after the parties had agreed on a settlement of a patent infringement case and stated in court that they agreed with the detailed settlement terms that had been read into the record and after the parties were unable to agree upon all the provisions of a judgment, the district court properly entered a judgment that, except in relatively minor aspects, was identical to the stated settlement agreement. The defendant contends that the parties had not agreed on the terms of the settlement judgment and that the district court therefore improperly entered it. We reject that contention and affirm the judgment.

## I.

A. The appellee Core–Vent Corporation (Core–Vent) sued the appellant Implant Innovations, Inc. (3–I) in the United States District Court for the Central District of California for infringement of its 4,960,381 patent ('381 patent), which covers an anchor for a dental implant. On the first day of trial, December 14, 1993, after a jury had been selected, the lead attorney for 3–I, Mr. Foote, stated: "I think we have a deal." The court replied:

If you have a settlement, state it on the record....

One of you go the lectern and state it for the record. I invite your attention to the statement of settlement. I'm going to ask each of you for your response and acknowledgement to the settlement after it's been stated for the record.

If there is no settlement—this is not a sparring time—the jury will automatically come out and we will just continue with the trial.

State the settlement for the record.

Mr. Bright, the attorney for Core–Vent, then stated:

The settlement terms are as follows:

Number one: the defendant [3–I] will enter into a consent judgment that:

A. The 381 patent is valid and enforceable against defendant [3–I];

B. The defendant's mini-plant and internally hexed cylinder implants infringe claims 36, 39 and 40 of the 381 patent;

C. The defendant's mini-plant implants infringe claims 7, 10 and 11 of the 381 patent;

D. That plaintiff and defendant shall each bear its own attorney's fees and costs;

E. That this court shall retain jurisdiction to enforce this judgment.

Two: Defendant [3–I] to pay Core–Vent $450,000 for past infringement of the 381 patent and receive a release.

Three: Defendant [3–I] to pay Core–Vent a running royalty of 20 percent of one and one half times defendant's net sales of the infringing implants, namely of the mini-plant implant and the internally hexed cylinder implants of defendant [3–I] for the calendar year 1994.

Four: Defendant [3–I] to pay Core–Vent a running royalty of 20 percent of one and one half times defendant's net sales of these same infringing implants, namely the mini-plant implant and the internally hexed cylinder implants for each succeeding year, beginning with January 1, 1995; subject to defendant paying a minimum royalty of $125,000 for each six-month period, beginning January 1, 1995. And with these running royalties for 1995 and later being fully creditable against the minimum royalty.

Five: Defendant can elect to discontinue selling all infringing implants after January 1, 1995, at any time, solely at defendant [3–I's] election on six month's written notice to Core–Vent, and thereafter defendant [3–I] may stop paying the minimums mentioned in the fourth item, that is, the minimums that begin with January 1, 1995.

Six: Defendant [3–I] to pay royalties on all infringing implants made or sold in each country other than the United States where Core–Vent has a patent in force with a claim covering one or both of the infringing implants.

And finally, defendant [3–I] to receive a credit of $50,000 against the royalties payable in the calendar year 1994, and $50,000 credit against royalties, if any, payable in 1995. And I believe that's the last of it.

(Brief pause)

Mr. Bright: And in return for the sums that defendant [3–I] is paying, defendant [3–I] shall have a non-exclusive worldwide license under Core–Vent's 381 patent, and the foreign counterparts to that patent, namely the patents in Canada, U.K., Japan and Germany.

Now, is there anything missing, Mr. Foote?

In response to the court's question whether that was "the core settlement, as you understand it?" Mr. Foote replied: "That is correct." The court then stated that "I will ask the individual clients now, the parties whether or not that is an acceptable settlement to conclude this case, Yes or No. Yes

or no?" The president of Core–Vent, Dr. Niznick, answered "yes" and the president of 3–I, Mr. Beaty, answered "yes, your honor; settled." Mr. Bright said "yes" and Mr. McCabe, another lawyer for 3–I, stated "settled." The court then stated: "The case is settled now." It explained:

This is the core settlement that all sides have accepted. The attorneys will reduce this to a judgment and submit it to the court for signature.

So long as the core settlement is accepted, we have a settlement. I do not expect the parties to try to negotiate new terms in words that may not have been expected by you. The attorneys are now directed by the court to prepare a judgment in conformity with the settlement that has now been expressed on the record.

Mr. Bright, you as plaintiff's attorney will prepare that final judgment, tender it to Mr. Foote for acceptance as to form and content, and tender it to the court for my signature, and the case is done.

The court then excused the jury, explaining that the parties "have resolved their differences," that "the matter has been satisfactorily resolved by the parties."

B. Core–Vent's counsel submitted to 3–I's counsel a proposed consent judgment and a proposed patent license. The parties were unable, however, to agree upon the terms and provisions of these documents.

Core–Vent then moved the district court to enter a proposed judgment which it described as "substantially word-for-word in conformity with the terms of settlement stated on the record." 3–I opposed entry of the judgment, on the "grounds that a complete settlement of the dispute between the parties has not yet been reached and, therefore, it would be improper for judgment to be entered at this time."

The district court entered the proposed judgment as its final judgment. As explained in part II of the opinion, with relatively minor exceptions the provisions of the judgment were the same as the settlement orally presented to the district court.

3–I moved the district court to reconsider the entry of judgment. Attached to the mo-

tion was "new evidence" on "the issue of whether a meeting of the minds took place on the license agreement that was an integral part of the core settlement terms agreed to by the parties"—an issue on which, according to 3–I, an evidentiary hearing was required.

After oral argument, the court denied reconsideration. The court stated:

There is no full agreement between the parties for a license agreement to be reduced in writing unless you reduce it in writing with agreeable terms. It seems to me the parties quite clearly should be able to arrive at a licensing agreement within the limit of the terms that we have spelled out in the judgment.

. . . .

... The license terms were spelled out on record here in court. They are the essential terms that have been spelled out. What I'm trying to do is get the two sides to get together to insert those terms in that you want and agree to it so that we can put this thing down to a finality and pass you.

But the terms that have been spelled out in the judgment and orally here in court are adequate enough to say that the license agreement that was orally stated in court is your license agreement. So let's be clear about that.

## II.

■ A. The record establishes beyond question that after the hearing at which Mr. Bright stated the detailed terms of the settlement, the parties, their attorneys and the court understood and agreed that the case was settled on those terms. The presidents of both companies answered affirmatively to the court's question whether the terms Mr. Bright had stated were "an acceptable settlement to conclude this case." The court also stated that "If there is no settlement—this is not a sparring time—the jury will automatically come out and we will just continue with the trial."

After the parties and counsel had stated their acceptance of the settlement, the court announced: "The case is settled now." The court directed the attorneys to "reduce this

to a judgment and submit it to the court for signature." The court anticipated and intended that preparing the judgment that would embody the settlement would be a routine task. As the court stated:

I do not expect the parties to try to negotiate new terms in words that may not have been expected by you. The attorneys are now directed by the court to prepare a judgment in conformity with the settlement that has now been expressed on the record.

Mr. Bright, you as plaintiff's attorney will prepare that final judgment, tender it to Mr. Foote for acceptance as to form and content, and tender it to the court for my signature, and the case is done.

3–I contends, however, that the settlement agreement stated in open court was incomplete because the parties understood and intended that an essential element of the settlement was the execution of a separate written patent license, upon which the parties were unable to agree. It points out that when Mr. Bright, in accordance with the court's directions, undertook to "prepare a judgment in conformity with the settlement that has now been expressed on the record," he drafted and circulated both a proposed judgment and a proposed patent license. 3–I invokes the principle that, although "a district court retains inherent jurisdiction and equitable power to enforce agreements entered into in settlement of litigation before that court[,] ... the district court only retains the power to enforce *complete* settlement agreements; it does not have the power to impose, in the role of a final arbiter, a settlement agreement where there was never a meeting of the parties' minds." *Ozyagcilar v. Davis,* 701 F.2d 306, 308 (4th Cir.1983) (emphasis in original).

We agree with the district court, as it stated in denying reconsideration, that "the terms that have been spelled out in the judgment and orally here in court are adequate enough to say that the license agreement that was orally stated in court is your license agreement." The agreed-to settlement stated in court specified in detail the royalties 3–I would pay, and provided that in return for those royalties "[3–I] shall have a non-exclu-

sive worldwide license under Core–Vent's 381 patent, and the foreign counterparts to that patent, namely the patents in Canada, U.K., Japan and Germany." Thus, 3–I errs in its statement that "the core settlement announced in open court provided that the parties would agree to enter into a license agreement." The settlement agreement did not state that there would be a separate patent license, but only that 3–I "shall have" a license.

Mr. Beaty, the president of 3–I, stated in his declaration in support of 3–I's motion for reconsideration that it was his "understanding" at the conclusion of the settlement discussions that one of the "core" settlement terms "was that the parties would enter into a written license agreement, many of the material terms of which still remained to be negotiated by the parties, including a term that no royalties under Core–Vent's '381 patent would continue to be due if the '381 patent was found to be invalid and/or unenforceable in any subsequent judicial or administrative proceeding", and that "I would not have indicated my assent to the core terms of the parties' settlement read in open court had I believed that this term was not part of [3–I's] agreement with Core–Vent." If that was Mr. Beaty's understanding of the settlement, he should not have indicated his agreement with the settlement as stated in court, but should have insisted that it include a provision providing for a separate patent licensing agreement and defining its terms. Instead, he accepted the settlement without equivocation. "A settlement agreement is a contract." *Mahboob v. Department of the Navy,* 928 F.2d 1126, 1128 (Fed.Cir.1991). "Since contractual obligations are to be ascertained from objective manifestations of intent, plaintiff's mental reservations are legally irrelevant." *David Nassif Assocs. v. United States,* 557 F.2d 249, 257, 214 Ct.Cl. 407 (1977).

Mr. Bright's preparation and circulation of both a judgment and a patent licensing agreement is not inconsistent with and does not undermine our conclusion that the settlement stated in court did not require a separate licensing agreement. There is material in the record indicating that settlements of

patent infringement litigation, under which the alleged infringer may continue to manufacture and/or sell the alleged infringing product, customarily include a written licensing agreement. Mr. Bright's drafting and circulation of a separate licensing agreement was designed to enable the parties to follow that practice, if they could agree upon its terms.

During the next five weeks, however, the parties were unable to agree upon either the terms of the patent licensing agreement or, indeed, the judgment settling the case. It was only then that Core–Vent submitted its proposed judgment to the district court for entry and the district court entered it. As the district court explained in denying reconsideration, the settlement agreement itself adequately set forth the terms of the patent license that the settlement provided for 3–I.

B. The three cases upon which 3–I principally relies are distinguishable and do not support its contention that the settlement agreement was incomplete.

In *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.,* 958 F.2d 355 (Fed. Cir.1992), the parties informed the district court clerk that they had agreed upon settlement of patent infringement litigation. A settlement agreement was then drafted, but neither party signed it. The plaintiff then "filed a motion to enforce settlement of the unexecuted April 25 draft agreement," which the district court, treating the motion as one for summary judgment, granted. *Id.* at 357.

This court reversed. Noting that "[a] district court does not have the power to impose a settlement agreement when there was never a meeting of the minds," it stated that "no reasonable fact-finder could conclude that the parties intended that the agreement would be binding without execution of the documents by both parties. Since Wang and ACS never in fact reached agreement on the terms and conditions of a settlement and never executed the documents, the district court erred in enforcing the draft as an agreement and thus granting Wang summary judgment." *Id.* at 359–60. The court also stated that a district court "does not have the power to make an agreement for the parties or to decide, contrary to the facts

and the law, that a draft settlement agreement was binding when the parties did not agree on it." *Id.* at 359.

The holding in *Wang Laboratories* was that the verbal draft settlement agreement was not a binding agreement, and that summary judgment enforcing it therefore was improper. Unlike the present case, where the parties affirmatively stated that they had agreed upon the settlement stated in open court, the court in *Wang Laboratories* held that the parties "never in fact reached agreement on the terms or conditions of a settlement." *Id.*

In *Callie v. Near,* 829 F.2d 888, 890 (9th Cir.1987), the appellees' counsel wrote to appellants' counsel "to confirm" and describe the terms of an alleged settlement. When the appellees' counsel sent a proposed stipulation to the appellants' counsel, however, the appellants refused to execute it. On the appellees' motion, the district court, without an evidentiary hearing, entered judgment against the appellees for the amount proposed in the prior letter.

The court of appeals held that the district court erred in entering judgment without an evidentiary hearing, because there were two disputed factual issues regarding the existence of a binding settlement: (1) "[w]hether the parties intended only to be bound upon the execution of a written, signed agreement" and (2) whether "the parties ... had a meeting of the minds regarding the precise method for securing payment of the settlement." *Id.* at 890–91.

Finally, in *Ozyagcilar,* 701 F.2d 306, just before trial the parties in patent litigation reached a settlement, which was reflected in a signed outline of the settlement agreement. After the outline was read into the record, the parties agreed that the court would resolve any dispute regarding the settlement and the meaning of its words. A dispute arose over the meaning of one of the terms during the drafting of the formal settlement agreement. On the basis of affidavits and briefs but without an evidentiary hearing, the district court itself interpreted the term differently from either of the parties.

The court of appeals reversed. It stated that the district court's action "leaves open the question as to whether there ever was a complete settlement agreement to interpret, let alone its proper interpretation. The court's ruling therefore cannot stand." *Id.* at 308. The court also stated:

> The proper role of the district court in enforcing settlement agreements ... [is] "to find, if he can the terms of the *complete* settlement agreement, or to determine that there was none." Thus it is improper for the district court, by its own motion or by agreement of the parties, to place itself in the role of a "final arbiter" of a settlement agreement. Instead, on remand, the district court should, after a plenary hearing, determine if there was a settlement agreement between the parties and, if so, its terms and conditions.

*Id.* (citation omitted) (emphasis in original).

Thus, in each of these three cases, the ground of reversal by the appellate court was that there was a disputed factual issue whether the parties actually had entered into a settlement agreement. In the present case, however, there is no question that at the hearing at which the settlement was stated, all the parties and their lawyers and the district court stated that the case was settled on the terms described in the settlement agreement. There is no claim in this case that what transpired at that district court hearing did not constitute a settlement of the case.

### III.

3–I next challenges certain variations between the settlement provisions stated at the initial hearing before the district court and those included in the final judgment.

■ A. The stated settlement provided that 3–I would have a "non-exclusive worldwide license under Core–Vent's '381 patent, and the foreign counterparts to that patent, namely the patents in Canada, U.K., Japan and Germany." The final judgment, however, added to this language the words "to make, have made, use and sell [3–I's] Mini-plant implant and its internal hexed cylinder implant, as shown in Exhibits A and B, re-

spectively." 3–I states that, when it agreed to the settlement, it "had understood that the license would cover all infringing products which it presently sold, with any modifications thereto that still fell within the claims of the '381 patent."

The settlement agreement stated that 3–I's "mini-plant and internally hexed cylinder implants infringe" specified claims of the '381 patent. The future royalties were a percentage of 3–I's "net sales of the infringing implants, namely of the mini-plant implant and the internally hexed cylinder implants." The settlement also provided that 3–I would pay royalties "on all infringing implants made or sold" in any country outside the United States where Core–Vent has a patent claim "covering one or both of the infringing implants."

■ Since the infringement related solely to 3–I's "mini-plant and internally hexed cylinder implants" and the future royalties would be based upon 3–I's sales of those two products, the district court reasonably construed the license provision in the settlement agreement as limited to those products. Since a settlement is a contract, it is appropriate to consider principles of contract interpretation in determining the validity of a judicial decree enforcing a settlement. A contract "must be read as a whole ... [and] interpreted in a manner which gives meaning to all its parts and in such a fashion that the provisions do not conflict with each other, if this is reasonably possible." *B.D. Click Co. v. United States,* 614 F.2d 748, 753, 222 Ct.Cl. 290 (1980). Here, the district court interpreted the agreement reasonably to harmonize the license provision with the infringement and royalty provisions.

Moreover, as the court stated at the hearing on reconsideration:

> The reasons why the nonexclusive license agreement never came up was that your client wanted to continue to do business.
>
> In order to continue to do business and not to suffer from the inability to respond to his clients why he is not selling 3–I implants anymore, he said, "Let me continue to sell your products, these two products." To which Mr. Niznick said, "No

problem. You can have a nonexclusive license agreement."

That is basically the terms that were said to my ears in chambers. They weren't said on the record. But the fact of the matter is, the nonexclusive licensing agreement was a vehicle by which your client is to continue doing business so that he can continue to make available to his clientele the two implants that were at issue so that he can continue his business. That's all that was for.

■ B. The settlement provided for 3–I to pay Core–Vent (1) $450,000 "for past infringement" and (2) running royalties based on a percentage of 3–I's sales of the infringing products for 1994 and subsequent calendar years. The settlement did not expressly deal with royalties for the 17 days between the settlement date (December 14, 1993) and January 1, 1994, when the running royalties were to begin.

The final judgment provided that the running royalties would cover the period December 15, 1993 through December 31, 1993, as well as subsequent years.

Once again, we conclude that the district court reasonably interpreted the settlement agreement. Once settlement was reached and agreed upon, the date of the settlement marked the end of "past infringement." Since the detailed royalty provisions indicated that the parties intended that royalties would be paid on all of 3–I's sales of the infringing implants, both past and future, the district court properly filled in the details by specifying that the running royalties would cover the brief period between the settlement agreement and the beginning of the next calendar year.

■ C. As noted, the settlement stated that 3–I would pay Core–Vent $450,000 for past infringement. The final judgment provided for that payment "plus interest thereon at the legal rate until fully paid." Here, too, the district court properly implemented the settlement agreement by providing for interest for the interim until 3–I made the payment for past infringement it had agreed to make.

3–I contends, however, that it understood that it could pay the $450,000 over five years with interest on the outstanding balance at one percent over the prime rate. If this was a term of the settlement, 3–I should have raised the point when the settlement was stated at the initial court hearing.

## IV.

Finally, 3–I argues that the district court should have held an evidentiary hearing to resolve allegedly disputed material factual issues involving the terms of the settlement. Those issues, however, related to 3–I's contention that the settlement agreement was incomplete because the parties understood and intended that other terms and provisions would be included.

Our holding that the settlement agreement was complete and provided a proper basis for entering a judgment in substantial accordance with it disposes of this contention. " '[C]ourts have inherent power summarily to enforce a settlement agreement with respect to an action pending before it.' " *Cheyenne–Arapaho Tribes of Indians v. United States,* 671 F.2d 1305, 1309, 229 Ct.Cl. 434 (1982) (quoting *Dacanay v. Mendoza,* 573 F.2d 1075, 1078 (9th Cir.1978)). In the circumstances of this case, there were not disputed issues of material fact that required a hearing. Here, the parties stated on the record both the terms of the settlement and their unqualified agreement to it. "[N]o hearing is necessary where there is no dispute as to the existence of a settlement." *Tiernan v. Devoe,* 923 F.2d 1024, 1031 (3d Cir.1991).

## V.

"It is long established that courts favor dispute resolution through voluntary settlements.... 'Those who employ the judicial appellate process to attack a settlement through which controversy has been set to rest bear a properly heavy burden.' " *S & T Mfg. v. County of Hillsborough,* 815 F.2d 676, 678 (Fed.Cir.1987) (quoting *Asberry v. USPS,* 692 F.2d 1378, 1380 (Fed.Cir.1982)) (citations omitted). 3–I has not satisfied that burden.

## CONCLUSION

The judgment of the district court is **AFFIRMED.**