**INAMED CORPORATION, Inamed Development Company and Bioenterics Corporation, Plaintiffs,**

v.

**Lubomyr I. KUZMAK, Defendant.**

**No. CV 99–02160 MMM.**

United States District Court,
C.D. California,
Western Division.

May 28, 2002.

---

Shirli Fabbri Weiss, Gray Cary Ware & Freidenrich, Stewart M. Brown, Gray Cary Ware & Freidenrich, San Diego, CA, for Plaintiffs.

Jonathan Solish, Steven J. Prough, Jenkens & Gilchrist, Marjorie E. Lewis, Gail Jeanne Standish, Gibson Dunn & Crutcher, Wayne M. Barsky, DoHoang Thien Duong, Gibson Dunn & Crutcher, Los Angeles, CA, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PARTIAL SUMMARY JUDGMENT FOR DEFENDANTS

MORROW, District Judge.

On February 26, 1999, plaintiffs Inamed Corporation, Inamed Development Company, and Bioenterics Corporation filed a complaint against Lubomyr I. Kuzmak, seeking a declaration that certain patents held by Kuzmak were invalid and unenforceable, and that plaintiffs had not infringed the patents. Plaintiffs also alleged that Kuzmak had engaged in patent misuse, and that he had breached certain licensing agreements. The parties engaged in settlement negotiations regarding these and other disputes that culminated in a letter agreement on January 24, 2000. A dispute arose regarding the enforceability of the agreement, however, and claims related to that issue were added to the action in plaintiffs' First Amended Complaint. Kuzmak has since sold his interest in the patents and the damage claims asserted in his counterclaim against the Inamed companies to Ethicon Endo–Surgery, Inc., which was added as a co-defendant/counterclaimant on March 6, 2002.

Plaintiffs have moved for summary judgment on their seventh cause of action, which seeks specific performance of the purported settlement agreement, or alternatively, for partial summary judgment on their eighth cause of action, which seeks damages for its breach. Because the court finds that there are no triable issues of material fact regarding the enforceability of the letter agreement, that it is not enforceable as a matter of law, and that plaintiffs have had notice and an adequate opportunity to bring forward all evidence

relevant to the question, it grants partial summary judgment in defendants' favor on plaintiffs' seventh and eighth causes of action.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Lubomyr Kuzmak is the inventor or co-inventor of a silicone gastric band used in treating morbid obesity (the '339 patent) and a gastrostenometer used to measure the exact size of the stoma opening (the '288 patent). He has also secured two other patents relative to gastric banding—the '868 patent (for a "reversible" gastric band) and the '429 patent. The complaint and answer/counterclaim allege that between 1989 and 1993, Kuzmak and Inamed Development Corporation entered into four license agreements concerning the patents-in-suit. Inamed agreed to pay Kuzmak a royalty for the right to exploit the patents.[1] Between 1992 and 1998, it manufactured and sold gastric bands pursuant to the license, and made annual royalty payments to Kuzmak of more than $1.3 million. In 1998, Inamed allegedly attempted to renegotiate the license agreements because it believed that some of the patents were invalid or unenforceable, and felt that the agreements had an improper territorial scope.[2] After negotiations proved unsuccessful, Inamed terminated the agreements, in accordance with their provisions, on December 6, 1998.[3] Kuzmak sought to arbitrate the issue of royal-

ties allegedly due under the 1993 license, and Inamed filed suit, seeking a declaratory judgment that Kuzmak's patents were invalid and that it had not infringed the patents.

The present motion does not address the merits of the parties' underlying disputes but rather the enforceability of a purported settlement of those disputes that was reached in January 2000. As respects the parties' negotiations and purported agreement, the following facts are undisputed unless otherwise noted. Roxana Kuzmak has been married to Lubomyr Kuzmak for more than 35 years. She has served as her husband's business manager since 1989,[4] and has held power of attorney for his business affairs since 1999.[5] Roxana supervised the work of Kuzmak's attorneys in this case.[6]

■ From 1989 until 1998, Kuzmak was party to four successive license agreements with Inamed.[7] Kuzmak personally signed each of the agreements.[8] Inamed gave notice of its intention to terminate the last of the agreements, which Kuzmak executed in 1993, on November 6, 1998.[9] Less than two weeks later, Inamed's lawyer sent Kuzmak's attorney a proposal for a license to exploit the '288 and '429 patents, which included a $200,000 lump sum royalty to be paid over four years and a covenant not to sue on the '339 and '868 patents.[10] In February 1999, Kuzmak demanded that Inamed arbitrate the royal-

---

1. Supplemental and Amended Complaint ("Supp.Complaint") at ¶¶ 10–13; Ex. 1 (the "License Agreement").

2. Supp. Complaint, ¶ 42.

3. *Id.*, ¶ 43.

4. Defendants' Additional Uncontroverted Facts ("Defs.' Add. Facts"), ¶ 1; Plaintiffs' Opposition to Separate Statement of Additional Uncontroverted Facts ("Pls.' Opp. Facts"), ¶ 1.

5. Defs.' Add. Facts, ¶ 2; Pls.' Opp. Facts, ¶ 2.

6. *Id.*

7. Defs.' Add. Facts, ¶ 3; Pls.' Opp. Facts, ¶ 3.

8. Defs.' Add. Facts, ¶ 5; Pls.' Opp. Facts, ¶ 5.

9. Defs.' Add. Facts, ¶ 6; Pls.' Opp. Facts, ¶ 6.

10. Defs.' Add. Facts, ¶ 7; Pls.' Opp. Facts, ¶ 7.

ties due under the 1993 license agreement before the American Arbitration Association.[11] On February 26, 1999, Inamed filed this lawsuit, seeking a declaratory judgment that Kuzmak's patents were invalid and that it had not infringed.[12] While litigating the royalty issue before the AAA, and while an appeal of this court's ruling regarding personal jurisdiction over Kuzmak was being considered by the Federal Circuit, Inamed and Kuzmak exchanged a number of letters regarding the terms of a possible settlement of the parties' disputes.[13]

On October 1, 1999, Kuzmak's lawyer wrote Inamed's attorney to communicate an "offer of settlement" from his clients. The offer included provisions for (1) payment of past due royalties under the 1993 license agreement and an audit of Inamed's books to enable Kuzmak to determine the amount of royalties due under that agreement; (2) an acknowledgment that Kuzmak was the sole inventor of the '429 patent; (3) payment of a nonrefundable lump sum based on estimates of future sales of the lap band and royalties on sales above the estimate; (4) an agreement that Kuzmak would grant Inamed an exclusive license to exploit his gastric band patents; and (5) an agreement that Kuzmak would make available the medical records Inamed required to obtain market approval by the Food and Drug Administration ("FDA") of its lap band device.[14]

Inamed responded on October 5, 1999, with what it termed a "final offer of settlement." It offered to pay (1) $500,000 in settlement of Kuzmak's claim for past royalties due under the 1993 agreement and any exploitation of the patents prior to the date a new license agreement was signed; and (2) $2,000,000 as an advance against future U.S. royalties, to be paid within sixty days of pre-market approval ("PMA") by the FDA of Inamed's lap band device. As respects future payments, it proposed a 3 % royalty on lap band sales, with a guaranteed royalty of $36 per unit. Inamed proposed that the license remain in effect through 2005, when the '339 patent

---

**11.** Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law ("Pls.' Facts"), ¶ 1; Ethicon's and Kuzmak's Statement of Genuine Issues ("Defs.' Issues"), ¶ 1. (Plaintiffs have submitted separate but identical statements of undisputed facts in support of summary judgment on their seventh and eighth claims, with the exception of Fact No. 22, which is offered in support of summary judgment on the seventh, but not the eighth, claim for relief. For simplicity, the court will cite the facts offered in support of the seventh cause of action.) Plaintiffs dispute defendants' proffered fact regarding the amount of royalties Inamed allegedly owed Kuzmak as an improper legal conclusion and irrelevant. (Defs.' Add. Facts, ¶ 8; Pls.' Opp. Facts, ¶ 8.) Rule 401 of the Federal Rules of Civil Procedure defines relevant evidence as proof "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. In the context of this motion, which concerns the enforceability of the January 24, 2000 letter agreement, Kuzmak's contention that royalties were due under the 1993 license agreement, the amount of the royalties that allegedly remained unpaid, and Kuzmak's initiation of an AAA arbitration to secure their payment are relevant in assessing the materiality of various terms that were and were not included in the January 24, 2000 letter agreement. The court interprets defendants' proffered Fact No. 8 as a statement of Kuzmak's contentions in this regard, not as a statement that his contentions were correct. Thus, plaintiffs' objections are overruled.

**12.** Pls.' Facts, ¶ 2; Defs.' Issues, ¶ 2; Defs.' Add. Facts, ¶ 9; Pls.' Opp. Facts, ¶ 9. Ethicon was added as a defendant and counterclaimant pursuant to the court's order on March 6, 2002.

**13.** Pls.' Facts, ¶ 3; Defs.' Issues, ¶ 3.

**14.** Declaration of Stewart M. Brown ("Brown Decl."), Ex. 5.

expired, and that the parties meet in 2004 to discuss a possible license under the '429 patent based on products and methods in use at that time. It agreed not to dispute that Kuzmak was the inventor of the '429 patent, so long as he agreed to abandon his Application No. 09/205,195 and his attempt to provoke an interference with Patent No. 5,601,604. Finally, Inamed requested that Kuzmak grant it "immediate access" to clinical data so that it could prepare submissions due in connection with FDA approval at month's end.[15]

On October 13, 1999, Kuzmak made the following "counter-proposal": (1) that Inamed pay $1,000,000 in consideration of his claim for past due royalties under the 1993 license agreement and any exploitation of the patents prior to execution of a new license agreement; (2) that Inamed pay Kuzmak $36 for every lap band manufactured or sold in the United States or any foreign country where Kuzmak held a patent or had a patent application pending; (3) that Inamed pay Kuzmak a $3,000,000 non-refundable advance against royalties, one-half to be paid upon execution of an agreement and one-half by March 31, 2000; (4) that Inamed recognize Kuzmak as the sole inventor of the '429 patent; (5) that Kuzmak maintain his Application No. 09/205,195, and that Inamed reissue Patent No. 5,601,604, with narrower claims reflective of a particular embodiment; and (6) that Kuzmak grant Inamed an exclusive license to exploit the '339, '288, '429, '176, and all related foreign patents, with the license remaining in effect until the last of the patents expired.[16]

Inamed's attorney responded on October 14, 1999. The letter noted that the parties had made progress on certain points, but moved farther apart on others. It stated that, if a resolution could be reached on other outstanding issues, Inamed would address Kuzmak's demand for an amount in excess of $500,000 on the past due royalties claim. It then offered the following point-by-point response to the Kuzmaks' proposal: (1) noting that Kuzmak had apparently accepted the $36 royalty figure, Inamed rejected the concept of a royalty based not only on sales, but on units manufactured as well; (2) it similarly rejected Kuzmak's proposal that it pay a royalty on lap band sales in any foreign country where he had a patent application pending; rather, Inamed stated, it would agree to pay a royalty only in those countries where a patent had been issued to Kuzmak; (3) Inamed also rejected Kuzmak's counter-proposal regarding the amount and timing of the advance royalty payment, and reiterated its willingness to make a $2,000,000 non-refundable payment within sixty days of FDA approval of the PMA; (4) it indicated that it would recognize Kuzmak as the sole inventor of the '429 patent; (5) it suggested that the parties eliminate issues involving Kuzmak's Application No. 09/205,195 and Inamed's Patent No. 5,601,-604 from the scope of the settlement; (6) it asserted that Kuzmak's obligation to provide the clinical data Inamed needed to prepare submissions to the FDA had no connection with the ongoing disputes, that it required access to the information immediately, and that if the matter could not be resolved, it would be forced to bring the issue to the attention of a court promptly; and (7) it stated that inclusion of the '288 and '176 patents in the proposed license agreement was not necessary, and that it did not wish to license the '429 patent beyond 2005.[17]

On October 20, 1999, Kuzmak's attorney responded. He agreed that settlement of

15. *Id.,* Ex. 6.

16. *Id.,* Ex. 7.

17. *Id.,* Ex. 8.

the past royalties dispute should await resolution of the remaining issues, which he addressed in turn: (1) as respects Inamed's assertion that royalties should be paid only on the number of bands sold, as opposed to the number of bands manufactured, Kuzmak's attorney noted that manufacturing constituted infringement just as much as sale; (2) regarding foreign patents, he noted Inamed's apparent contention that none of Kuzmak's current patents covered the lap band, and thus that if the royalty obligation were limited to issued patents, there would be no obligation to pay royalties on foreign sales; (3) while stating that it "remained a problem," Kuzmak's attorney suggested that the amount and timing of the non-refundable advance royalty payment could perhaps be worked out if all other issues were resolved; (4) he questioned whether Inamed's letter meant it was unwilling to recognize Kuzmak as the "father" of stomach constriction technology; (5) he "reluctantly agree[d]" to remove issues related to Kuzmak's Application No. 09/205,195 and Inamed's Patent No. 5,601,604 from the scope of the settlement; (6) as respects Kuzmak's provision of clinical data for use in the preparation of documents to be submitted to the FDA, the attorney noted that he "remain[ed] hopeful that the parties [could] reach agreement in sufficient time to allow Inamed to meet all of its deadlines regarding FDA submissions"; (7) as respects Inamed's unwillingness to license the '176 patent, and its wish not to license the '429 patent beyond 2005, Kuzmak's attorney asserted that the claims of those patents covered the lap band and the procedure for inserting it, suggested inferentially that Inamed had to license the '176 patent, and stated that it was highly unlikely that Inamed would be in a position to cease

licensing the '429 patent in 2005, as no alternative method of inserting the lap band would be available at that time.[18]

Inamed's lawyer chose not to respond point-by-point, stating that his client had already "proposed a global, structured settlement" that it believed "fully compensated Dr. Kuzmak for his past contributions and provide[d] for a generous future income stream in light of the various outstanding issues of validity, ownership, enforceability, claim scope, etc. of the SCT patents." The attorney noted that Inamed had put "its best offer on the table," and that the matter was "simply not worth more to Inamed than what it ha[d] already offered." The letter concluded: "[I]f Dr. Kuzmak can accept an offer along the lines previously outlined, the parties should settle this matter. If not, please advise us accordingly"[19]

On October 22, 1999, Kuzmak's attorney wrote back a short letter, asserting that Inamed had "chosen to avoid answering the most basic question: Under what Kuzmak patents is [it] willing to pay royalties?" In this regard, he again raised the question of the foreign patents, the '176 patent, and the '429 patent.[20] Inamed's October 25, 1999, response reiterated that it was unwilling to extend the term of the proposed license agreement beyond the expiration date of the '339 patent. It clarified that it did not believe claim 41 of the '176 patent and Kuzmak's foreign patent covered the lap band, and asserted that the '429 patent, which claimed a surgical method, was of limited commercial value and of questionable validity and enforceability as well. The letter concluded: "As an offer of compromise in light of its positions with respect to Dr. Kuzmak's entire patent portfolio, Inamed has pro-

**18.** *Id.,* Ex. 9.

**19.** *Id.,* Ex. 10.

**20.** *Id.,* Ex. 11.

posed a package license with royalty payments extending into 2005, subject to renegotiation if warranted. If Dr. Kuzmak is not willing to similarly compromise, Inamed is confident is its ability to prevail on the issues of non-infringement, invalidity and unenforceability of the asserted patents. . . ." [21]

On October 29, 1999, Kuzmak's attorney "offer[ed] the following settlement proposal" on his client's behalf: (1) Inamed would pay $1,000,000 in settlement of Kuzmak's claim for past due royalties under the 1993 license agreement and exploitation of the patents prior to execution of a new license agreement; (2) Inamed would pay a royalty of $36 per lap band sold in the United States; (3) Inamed would pay a royalty of $12 per lap band manufactured in the United States and sold in a foreign country; (4) Inamed would pay a non-refundable advance royalty of $3,000,000 in two equal installments, the first of which would be due on March 31, 2000, and the second on September 30, 2000, or five days after PMA of the lap band by the FDA, whichever was earlier; (5) Kuzmak was to be acknowledged as the sole inventor of the '429 patent, and to have his contributions recognized in Inamed's promotional literature; (6) issues related to Kuzmak's Application No. 09/205,195 and Inamed's Patent No. 5,601,604 would be left for resolution by the Patent and Trademark Office; and (7) Kuzmak would license the '339 and '429 patents to Inamed exclusively until the '339 patent expired, at which point the parties would negotiate any necessary amendments to the license agreement on the understanding that the per-unit royalty for lap bands sold in the United States would not drop below 1% for the remainder of the life of the '429 patent.[22]

The letter also noted that Inamed had threatened to filed suit if Kuzmak did not make his clinical data immediately available for use in connection with Inamed's FDA submission, and made the following proposal in that regard:

"Dr. Kuzmak is willing to provide the FDA data as soon as the parties reach an agreement in princip[le] as long as Inamed is willing to provide a show of its good faith. In the latter regard, in order to provide Inamed virtually immediate access to Dr. Kuzmak's FDA data without having to wait for final drafting and review of the settlement agreement, Inamed should agree to pay Dr. Kuzmak $400,000 of the $1,000,000 [past due royalty settlement] in exchange for access to the FDA data. This $400,000 is nonrefundable and if no agreement is reached, belongs irrevocably to Dr. Kuzmak and, for example, is not to be applied, to any award by the AAA in the current arbitration." [23]

Inamed's lawyer responded on November 1, 1999, stating that his client was not willing to alter the settlement proposal it had made on October 20. Specifically, he stated that Inamed was not willing to pay Kuzmak an advance on royalties prior to FDA market approval of the lap band, and and was not willing to pay royalties on international sales of a product not covered by foreign patents. The letter reiterated Inamed's demand that Kuzmak immediately make his FDA data available, and noted that Inamed would file suit to obtain the information if required.[24]

Kuzmak, through his attorney, offered another "counter-proposal" on November 5, 1999, with the following terms: (1) that Inamed pay him $2,000,000 in settlement

21. *Id.,* Ex. 12.

22. *Id.,* Ex. 13.

23. *Id.* at 85.

24. *Id.,* Ex. 14.

of his claim for unpaid royalties under the 1993 license agreement, exploitation of the patents prior to execution of a new license agreement, and unremunerated contributions to the promotion and FDA approval of the lap band upon the signing of a new license agreement; (2) that Inamed pay a $36 royalty on lap bands sold in the United States; (3) that Inamed pay a non-refundable advance royalty of $2,000,000 within five days of FDA market approval of the lap band; (4) that Kuzmak be recognized as the sole inventor of the '429 patent and that his past contributions to stomach constriction technology be acknowledged in Inamed's promotional literature; (5) that the term of the license agreement be coextensive with the term of the '339 patent, and that the parties thereafter negotiate a further license agreement in good faith; and (6) that issues related to Kuzmak's Application No. 09/205,195 and Inamed's Patent No. 5,601,604 be resolved by the Patent and Trademark Office.[25] The letter stated that Kuzmak would be willing to give Inamed access to the FDA data "as soon as the parties reach[ed] agreement," and noted that the parties would have to agree "to use their best efforts to sign off on the formal agreement as soon as possible." [26]

Inamed's counteroffer, dated November 9, 1999, proposed the following: (1) that Inamed would pay Kuzmak $650,000 in settlement of his claim for unpaid royalties under the 1993 license agreement, exploitation of the patents prior to execution of a new license agreement, and unremunerated contributions to the promotion and FDA approval of the lap band on the following schedule: $400,000 upon the execution of a new agreement that "Inamed will use its best efforts to sign off on before the end of this year," and $250,000

upon the earlier of December 31, 2000, or PMA of the lap band; (2) that Inamed would pay a $36 royalty on lap bands sold in the United States, and no royalties on bands sold outside the United States; (3) that Inamed would pay an advance royalty of $2,000,000 within sixty days of FDA market approval of the lap band; (4) that issues related to Kuzmak's Application No. 09/205,195 and Inamed's Patent No. 5,601,604 be resolved by the Patent and Trademark Office; (5) that Inamed would not contest Kuzmak's inventorship of the '429 patent and "in its discretion" give Kuzmak credit in its literature for his contributions to the field of gastric banding; (5) that Kuzmak would grant Inamed an exclusive license under the '339 and '429 patents coextensive with the term of the '339 patent, and that, upon expiration, the parties would negotiate in good faith a further license of the '429 patent or any other Kuzmak patent if necessary in light of the state of the art at the time; and (6) Kuzmak would covenant not to sue Inamed on any patents not included in the license, including the '288 patent, the '868 patent, the reissued '176 patent, and any foreign patent corresponding to EP 0 611 561 B1.[27] As respects access to the FDA data, the letter states:

"Dr. Kuzmak will provide immediate access to the FDA data as soon as the parties reach an agreement in principle (and in no event any later than November 12, 1999). If the parties are unable to reach such an agreement, Inamed will pursue its rights under the Investigator's Agreements including seeking injunctive relief to prevent irreparable harm to the PMA process." [28]

The letter stated that Kuzmak would be willing to give Inamed access to the FDA

25. *Id.,* Ex. 15.

26. *Id.* at 91–92.

27. *Id.,* Ex. 15.

28. *Id.* at 94.

data "as soon as the parties reach[ed] agreement," and noted that the parties would have to agree "to use their best efforts to sign off on the formal agreement as soon as possible."[29]

Kuzmak's attorney responded on November 11, 1999. He noted Inamed's desire to obtain a covenant not to sue under certain of Kuzmak's patents, and its wish to sell lap bands manufactured in the United States in foreign countries without paying a royalty, and observed that these terms required that Kuzmak insist on a more substantial settlement amount and a more reasonable timetable for payment. He thus proposed a non-refundable settlement payment of $1,500,000, $1,000,000 of which would be paid upon execution of the settlement agreement, and $500,000 of which would be paid on or before May 31, 2000. As respects the covenant not to sue, the attorney noted that it would not cover Kuzmak's pending Application No. 09/205,195, as to which all rights were reserved. He observed that the parties were generally in agreement regarding the advance royalty payment, but stated that Kuzmak proposed the payment be made within thirty days of FDA approval, as opposed to the sixty contemplated by Inamed. He stated that "Dr. Kuzmak [would] require that Inamed release him from any and all claims of liability and that any filing of a declaratory judgment action or reexamination with respect to any of Dr. Kuzmak's patents by Inamed (or on behalf of Inamed) [would] result in immediate termination of the agreement."[30] Regarding the ongoing dispute over the provision of FDA data, the attorney offered "access to the FDA data as soon as an agreement in principle is reached."[31]

Inamed's November 12, 1999, response stated that it would modify neither the amount nor the timing of the settlement payment set forth in its November 9, 1999, offer. It further asserted that the covenant not to sue had to extend to Kuzmak's pending patent application, as it could not risk infringement litigation with him while paying millions of dollars in license fees. The November 12 letter once again threatened suit if Kuzmak refused to provide the data necessary to compile the FDA submission, and stated that Inamed would not agree to any extension of the scheduled AAA arbitration dates.[32]

On January 13, 2000, Kuzmak's attorney made "one final attempt to settle [the] matter." He stated that "Dr. Kuzmak [was] willing to accept all of Inamed's terms" set forth in the November 9, 1999, letter with "two fairly minor exceptions"i.e., the amount and timing of the initial payment, and the timing and terms of the non-refundable advance royalty payment. As respects the settlement payment for past due royalties, exploitation of the patents prior to execution of a license agreement and unremunerated past contributions to promotion of the lap band, Kuzmak proposed a lump sum payment of $850,000 upon execution of a settlement agreement. Regarding the advance royalty payment, he proposed that it be due "immediately" upon Inamed's receipt of PMA from the FDA, defined as a specific number of days necessary for transfer purposes. He further stated that the advance royalty would have to be guaranteed, through escrow, letter of credit or similar device, such that Inamed would not be able to contest or delay its payment. The letter concluded: "It is important that Inamed understand that this is truly a 'final' offer by the Kuzmaks.... The Kuzmaks are now at a point where they feel that if Inamed is not willing to settle on what are

---

**29.** *Id.,* Ex. 16.

**30.** *Id.,* Ex. 17.

**31.** *Id.* at 99.

**32.** *Id.,* Ex. 18.

essentially Inamed's own terms, then Kuzmak's long terms interests are best served by not entering any new agreement with Inamed."[33]

Inamed's attorney wrote back on January 18, 2000, stating that Inamed would not alter the amount of the initial settlement payment, but would accelerate payment of the advance royalty payment to a date thirty days following PMA.[34] A January 19, 2000, letter from Inamed's counsel confirmed "the details of the terms of the offer upon which the Inamed respondents will settle [the] matter."[35] It stated that the advance royalty payment would be made no later than thirty days following PMA, and that it would be "non-refundable, irrevocable and uncontestable." It further confirmed that Inamed would "agree to include language in the settlement agreement to this effect to guarantee payment." Regarding the $650,000 settlement amount, the letter proposed that it be paid in two installments—$400,000 upon execution of a settlement agreement, "which the parties will use their best efforts to sign off on as soon as possible," and $250,000 "within 90 days of execution of a settlement agreement." With these modifications, the letter stated, "all of the other terms of the settlement [would] be as set forth in our letter of November 9, 1999."[36]

A January 21, 2000 letter from Inamed's counsel referenced a telephone conference between counsel, and confirmed that Inamed would obtain a letter of credit to guarantee the advance royalty payment.

It requested that Kuzmak's counsel "let us know as soon as possible whether th[e] offer [was] acceptable to Dr. Kuzmak."[37]

On January 24, 2000, Inamed's lawyer sent Kuzmak's attorney a letter "confirm[ing] and outline[ing] the terms of the settlement agreement reached between the parties … in" the AAA arbitration, this action, and a New Jersey state court action that concerned Kuzmak's refusal to deliver the clinical data Inamed needed to prepare its FDA submission.[38] The letter recites the following substantive settlement terms:

- "In complete consideration of the settlement agreement including all of Kuzmak's claims against Inamed such as any past royalties allegedly owed under the 1993 License Agreement, any damages alleged from the date of termination until a new license is signed, and any alleged 'unrenumerated contributions,' Inamed will pay Kuzmak $650,000, to be paid as follows: $400,000 immediately upon execution of a settlement agreement, which the parties will use their best efforts to sign off on as soon as possible; and $250,000 within 90 days of execution of the settlement agreement."[39]

- "Inamed will pay a royalty of $36 (US) for every band that it sells in the U.S."[40]

- "No royalties will be paid for bands sold outside of U.S."[41]

- "Inamed will pay Kuzmak an advance against royalties based on sales … of $2,000,000 within 30 days of PMA, with the per unit royalty to begin after the

---

33. *Id.,* Ex. 19.

34. *Id.,* Ex. 20.

35. *Id.,* Ex. 21.

36. *Id.*

37. *Id.,* Ex. 22.

38. Pls.' Facts, ¶ 4; Defs.' Facts, ¶ 4; Pls.' Opp. Facts, ¶ 5; Defs.' Issues, ¶ 5; Brown Decl., Ex. 23.

39. Pls.' Facts, ¶ 6; Defs.' Issues, ¶ 6; Defs.' Add. Facts, ¶ 29; Pls.' Add. Facts, ¶ 29.

40. Pls.' Facts, ¶ 7; Defs.' Issues, ¶ 7.

41. Pls.' Facts, ¶ 8; Defs.' Issues, ¶ 8.

initial (55,555) bands are sold following execution of the settlement agreement. Inamed agrees that the $2,000,000 advance against royalties is non-refundable, irrevocable and uncontestable and will be guaranteed with a letter of credit." [42]

- "Kuzmak and Inamed will leave resolution of any interference that may be declared between U.S. Application Serial No. 09/205,195 (the "One–Size–Fits–All invention") and U.S. Patent No. 5,601,604 to be decided in a USPTO interference proceeding, if one is declared." [43]

- "Inamed will not contest Kuzmak's inventorship of the '429 patent and in its discretion will give credit to Kuzmak for his contributions in the field of gastric banding in its literature." [44]

- "Kuzmak will grant Inamed an exclusive license under the '339 and '429 patents coextensive with the term of the '339 patent. Thereafter, Kuzmak and Inamed agree to negotiate in good faith any license to the '429 patent or any other Kuzmak patents which may be applicable at that time if necessary in light of the future state of the art." [45]

- "Kuzmak will covenant not to sue Inamed on any of his other patents and patent applications, pending or future, not included in the license ..., including the '288 patent, the '868 patent, and any patent or application corresponding to the One–Size–Fits–All invention, including the reissued '176 patent and any foreign patent corresponding to EP 0 611 561 B1." [46]

The letter concluded with the statement: "If the terms outlined above reflect your understanding of the agreement reached between Kuzmak and Inamed, please indicate your acceptance by signing below and returning a copy to us." [47] Kuzmak's lawyer signed below the legend "Agreed and Accepted" on the last page of the document, and returned a copy to Inamed's lawyer.[48] Neither of the Kuzmaks signed the January 24, 2000, letter.[49]

Inamed's 1989, 1990 and 1991 license agreements with Kuzmak contained representations and warranties by both parties, as well as provisions regarding the assignment and transfer of Inamed's rights to the licensed patents; third party infringement; the grounds for and effect of a termination of the licenses; Kuzmak's right to audit and inspect Inamed's records; procedures for dispute resolution; indemnification of Kuzmak in connection with suits filed, costs incurred and losses sustained as a result of Inamed's use of his patents; and Inamed's obligation to use its best efforts to make, promote, and sell devices embodying the licensed patents. The 1993 license agreement incorporated these provisions from the earlier agreements. The January 24, 2000 letter, by contrast, did not include any such terms.[50]

The parties did not discuss assignability, third party infringement, representations and warranties, license termination, dispute resolution, indemnification, inspection or audit rights, Inamed's obligations to use best efforts, suspension of royalties, main-

---

42. Pls.' Facts, ¶ 9; Defs.' Issues, ¶ 9; Defs.' Add. Facts, ¶ 12; Pls.' Opp. Facts, ¶ 12; Defs.' Add. Facts, ¶ 37; Pls.' Add. Facts, ¶ 37.

43. Pls.' Facts, ¶ 10; Defs.' Issues, ¶ 10.

44. Pls.' Facts, ¶ 11; Defs.' Issues, ¶ 11.

45. Pls.' Facts, ¶ 12; Defs.' Issues, ¶ 12.

46. Pls.' Facts, ¶ 13; Defs.' Issues, ¶ 13.

47. Pls.' Facts, ¶ 14; Defs.' Issues, ¶ 14.

48. Pls.' Facts, ¶ 15; Defs.' Issues, ¶ 15; Brown Decl., Ex. 23 at 114.

49. Defs.' Add. Facts, ¶ 26; Pls.' Opp. Facts, ¶ 26.

50. Defs.' Add. Facts, ¶ 4; Pls.' Opp. Facts, ¶ 4.

tenance fees, a stipulation for the dismissal of pending litigation or the precise form of any releases during the negotiations leading up to execution of the January 24, 2000, letter.[51]

On January 27, 2000, the parties sent a letter to the American Arbitration Association, stating that they "ha[d] reached two separate agreements in principle that they believe[d would] resolve all outstanding issues in th[e] arbitration."[52] The letter "request[ed] an adjournment of the hearing dates and all related filing obligations," and asked "that the AAA place th[e] matter on a suspended docket until such time as the parties ha[d] an opportunity to reduce their settlement agreements to writing and to complete all major obligations under such settlement agreements."[53]

On February 16, 2000, Inamed's attorney sent Kuzmak's lawyer a "proposed draft of the Settlement Agreement" mentioned in the January 24, 2000 letter.[54] The draft contained a signature block for Dr. Kuzmak.[55] Approximately a month later, on March 22, 2000, Inamed's attorney sent Kuzmak's lawyer another letter

regarding the proposed agreement.[56] The letter, which followed a telephone conversation between counsel, noted that "Inamed remain[ed] willing to enter into a more formal agreement which reflect[ed] the terms of the settlement agreement already recorded by our letter of January 24, 2000." It also confirmed that "[t]he only issue that [Kuzmak's lawyer had] mentioned during [the telephone] conversation was the inclusion of the '429 patent in the covenant not to sue following expiration of the license," and noted that, "[i]f this is the only issue of concern to Dr. Kuzmak, . . . Inamed [would] not object to redrafting the corresponding section of the agreement to be consistent with our letter of January 24, 2000."

On March 29, 2000, Kuzmak's attorney responded. Noting that he "ha[d] been asked [in recent communication with plaintiffs' counsel] to provide . . . some feedback regarding the portions of the proposed Agreement that are most at odds with the terms of the agreement in principle that was signed on January 24, 2000,"[57] the lawyer detailed purported in-

---

**51.** Defs.' Add. Facts, ¶¶ 13–24; Pls.' Opp. Facts, ¶¶ 13–24.

**52.** Defs.' Add. Facts, ¶ 30; Pls.' Opp. Facts, ¶ 30. Plaintiffs state that it is "[u]ndisputed that the letter was sent. The document speaks for itself." The court has referred only to the existence of the document and therefore does not reach the objection to paragraph 14 of the Hunt declaration.

**53.** Hunt Decl., Exhibit 20.

**54.** Pls.' Facts, ¶ 16; Defs.' Issues, ¶ 16; Defs.' Add. Facts, ¶ 31; Pls.' Opp. Facts, ¶ 31. Plaintiffs object to paragraph 17 of the Hunt declaration, which asserts that the February 16, 2000, draft is inconsistent with January 24, 2000, letter agreement, on the basis that it offers a legal conclusion and constitutes improper opinion testimony. As the court has relied only on the document itself, and as plaintiffs dispute neither the transmission nor the contents of the letter, (see Pls.' Opp.

Facts, ¶ 31 (it is "[u]ndisputed that the document was sent. The document speaks for itself")), the court need not reach plaintiffs' objection.

**55.** Defs.' Add. Facts, ¶ 32; Defs.' Opp. Facts, ¶ 32.

**56.** Pls.' Facts, ¶ 17; Defs.' Issues, ¶ 17. Defendants state it is "undisputed that a letter was sent; the document speaks for itself." (Defs.' Issues, ¶ 17.) As they have not objected to either the exhibit or paragraph 19 of the Bamberger declaration, which authenticates it, the court deems the fact undisputed.

**57.** Pls.' Facts, ¶ 18; Defs.' Issues, ¶ 18. Defendants have objected to paragraph 20 of the Bamberger declaration, which summarizes and characterizes Hunt's March 29, 2000, letter, on the basis that it "mischaracterizes the evidence." As the court has relied only on the document itself, and as defendants

consistencies between the January 24, 2000, letter agreement and the February 16, 2000, draft. Among Kuzmak's "principal areas" of disagreement were: (1) the covenant not to sue on the '429 and other Kuzmak patents could not extend beyond expiration of the term of the '339 patent; (2) Kuzmak could not agree to the sweeping release of Inamed included in the draft agreement, as termination of the license and the covenant not to sue upon expiration of the term of the '339 patent gave rise to the specter of future litigation between the parties; (3) the advance royalty payment was to be "non-refundable, irrevocable and uncontestable," but the agreement recited that it was "non-refundable" once paid instead; (4) Inamed's obligation to pay the advance royalty ceased upon a judgment of invalidity or unenforceability; (5) the 3% royalty obligation was "imperfectly stated" in the agreement in principle as $36 per unit; (6) the agreement would appear to require that no royalties be paid on bands made in the United States, and sold outside the United States for importation and implantation in the United States.[58]

Inamed did not respond in writing to the March 29, 2000, letter.[59] Rather, on April 5, 2000, it filed suit against Kuzmak in district court in New Jersey.[60]

The FDA granted Inamed's PMA application for the lap band effective June 5, 2001.[61] On June 25, 2001, Inamed's lawyer wrote Kuzmak's attorney, reaffirming that "Inamed ... remain[ed] ready, willing and able to make the payments specified in paragraph (a) of the January 24, 2001, agreement, i.e., $400,000 upon execution and $250,000 within ninety (90) days of execution of the detailed agreement."[62] In February 2002, Inamed wrote Ethicon, which had by that time purchased Kuzmak's patents.[63] It stated: "Inamed has always been and continues to be, ready, willing and able to forward the amounts called for under the Settlement agreement and to comply with its other obligations...."[64] Inamed has never tendered the letter of credit guaranteeing the

dispute neither the transmission nor the contents of the letter (see Defs.' Issues, ¶ 18 (it is "undisputed that a letter was sent; the document speaks for itself")), the court need not reach defendants' objection.

58. Bamberger Decl., Ex. 6; Defs.' Add. Facts, ¶ 33; Pls.' Opp. Facts, ¶ 33.

59. Defs.' Add. Facts, ¶ 35; Pls.' Opp. Facts, ¶ 35.

60. Defs.' Add. Facts, ¶ 36; Pls.' Opp. Facts, ¶ 36.

61. Pls.' Facts, ¶ 19; Defs.' Issues, ¶ 19; Defs.' Add. Facts, ¶ 39; Pls.' Opp. Facts, ¶ 39.

62. Pls.' Facts, ¶ 20; Defs.' Issues, ¶ 20. While defendants object to paragraph 22 of the Bamberger declaration as hearsay, they do not dispute plaintiffs' proffered Fact No. 20, acknowledging that it is "undisputed that a letter was sent; the document speaks for itself." The court interprets defendants' Statement of Genuine Issues as an admission that Exhibit 8 to the Bamberger declaration is authentic and admissible, and thus deems plaintiffs' proffered Fact No. 20 undisputed for purposes of this motion. The court has not considered the paraphrase of Exhibit 8 set forth in paragraph 22 of the Bamberger declaration in ruling on the motion.

63. Pls.' Facts, ¶ 21; Defs.' Issues, ¶ 21. While defendants object to paragraph 23 of the Bamberger declaration as hearsay, they do not dispute plaintiffs' proffered Fact No. 21, acknowledging that it is "undisputed that a letter was sent; the document speaks for itself." The court interprets defendants' Statement of Genuine Issues as an admission that Exhibit 9 to the Bamberger declaration is authentic and admissible, and thus deems plaintiffs' proffered Fact No. 21 undisputed for purposes of this motion. The court has not considered the paraphrase of Exhibit 9 set forth in paragraph 23 of the Bamberger declaration in ruling on the motion.

64. Bamberger Decl., Ex. 10.

$2,000,000 advance royalty payment that was due within thirty days of PMA.[65]

## II. DISCUSSION

### A. Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmovant's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED. R.CIV.PROC. 56(e).

▮▮▮ In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is not sufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

▮▮▮ Plaintiffs assert that the January 24, 2000 letter agreement contains all the terms essential to a complete resolution of the parties' dispute, and that the parties intended that it be binding upon execution. Whether a contract is sufficiently definite and certain in its essential terms to be enforceable is a question of law for the court. See *Robinson & Wilson, Inc. v. Stone*, 35 Cal.App.3d 396, 407, 110 Cal. Rptr. 675 (1973). See also *Ladas v. California State Automobile Ass'n.*, 19 Cal. App.4th 761, 769 n. 2, 23 Cal.Rptr.2d 810 (1993); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 623, 2 Cal.Rptr.2d 288 (1991). Whether the parties intended that the letter agreement be a binding contract or rather an agreement to negotiate a further contract is a question of fact. *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308–09, 87 Cal.Rptr.2d 822 (1999).

### B. The Enforceability Of The January 24, 2000, Letter Agreement

### 1. The Authority Of Kuzmak's Attorney To Enter Into The Letter Agreement

▮▮▮ Defendants contend that the January 24, 2000, letter agreement is not an enforceable settlement agreement because

---

**65.** Defs.' Add. Facts, ¶¶ 38, 39; Pls.' Opp. Facts, ¶¶ 38, 39.

the uncontroverted evidence establishes that Ross Hunt, Kuzmak's lawyer, did not have his client's authority to settle the claims. In support of this assertion, defendants have submitted the declarations of Hunt and Roxana Kuzmak. Hunt states that he was not authorized by the Kuzmaks to enter into a binding license or settlement agreement, although he was authorized to negotiate on their behalf.[66] Similarly, Roxana Kuzmak states that she did not expressly authorize Hunt to settle any of the pending actions or compromise any of Kuzmak's claims.[67] Hunt also states that he did not send a copy of the January 24, 2000, letter agreement to the Kuzmaks for review before signing it.[68]

■ The initial question that must be answered regarding defendants' lack of authority argument is whether it was sufficiently preserved during the course of the litigation to provide a basis for entering summary judgment in their favor. Plaintiffs contend that Hunt's authority to enter into the January 24, 2000, letter agreement was never raised as an issue in the case prior to February 27, 2000—the day defendants' opposition to the summary judgment motion was filed. On that day, plaintiffs contend, Hunt waived the attorney-client privilege and testified to the matter during his deposition. No such defense was pleaded in Kuzmak's answer/counterclaim, and, prior to February 27, 2002, defendants' answers to interrogatories regarding the bases for their belief that the agreement was unenforceable did

not identify Hunt's lack of authority as an issue.[69] Indeed, even on February 26, 2002, the day Hunt before testified, defendants served supplemental interrogatory answers that failed to mention Hunt's lack of authority as one of the facts upon which they based their contention that the agreement was invalid or unenforceable.[70]

Given the belated manner in which the issue was raised, plaintiffs assert that defendants should be barred from arguing that the agreement is unenforceable because Hunt lacked authority to enter into it on Kuzmak's behalf. Rule 37(c)(1) of the Federal Rules of Civil Procedure, as amended in 1993, provides, in part:

"(1) A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED.R.CIV.PROC. 37(c)(1).

Inamed apparently contends that defendants failed seasonably to amend their prior contention interrogatory responses to reflect the fact that they intended to rely on Hunt's lack of authority, and thus that Inamed learned of the defense only during Hunt's deposition on the day defendants' opposition to this motion was filed. See FED.R.CIV.PROC. 26(e)(2) ("A party is under a duty seasonably to amend a prior re-

---

**66.** Hunt Decl., ¶ 15. Plaintiffs object to these statements as improper legal conclusion and opinion testimony. As the agent of his clients, however, Hunt is competent to testify to the scope of express authority he was given. Accordingly, the objection is overruled.

**67.** Declaration of Roxana Kuzmak ("Kuzmak Decl."), ¶ 7. Plaintiffs object to this statement as improper legal conclusion and opinion testimony. As Hunt's client, Kuzmak is competent to testify to the scope of the authority she

gave him. Accordingly, the objection is overruled.

**68.** Hunt Decl., ¶ 16.

**69.** See, e.g., Declaration of Richard T. Mulloy ("Mulloy Decl."), Ex. 1.

**70.** Declaration of Stewart Brown in Support of Plaintiffs' Reply ("Brown Reply Decl."), Ex. 1.

sponse to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing").

Rule 37(c)(1) provides that a preclusion sanction shall be imposed unless the party failing to disclose the information acted with substantial justification or the failure to disclose was harmless. Here, defendants offer no justification for their belated disclosure of the lack of authority defense, and it is difficult to conceive how they could. There is no suggestion that the Kuzmaks only recently realized that Hunt acted without authority, nor, given the nature of the defense, could there be. This is the type of a defense that must have been known to the Kuzmaks from the moment Inamed asserted that the January 24, 2000, agreement gave rise to enforceable rights. Yet only in the last several months have they seen fit to assert it in this proceeding.

Similarly, there can have been no misapprehension that defendants' prior interrogatory answers were incomplete, as they did not apprise Inamed that Kuzmak contended Hunt lacked authority to enter into the January 24, 2000, letter agreement on his behalf. Defendants knew that Inamed was unaware they intended to rely on this defense in opposing summary judgment or defending at trial. Yet they took no steps to advise Inamed of the defense or to supplement their earlier interrogatory answers. Learning of the defense only after it had filed its motion for summary judgment placed Inamed at a distinct disadvantage and constituted unfair surprise. It

was required to digest Hunt's deposition hurriedly and to respond to the argument only in reply. Thus, there is no substantial justification and an affirmative showing of prejudice. Together, they warrant imposing the preclusion sanction contemplated by Rule 37(c)(1). See *Pfingston v. Ronan Engineering Co.,* 284 F.3d 999, 1005 (9th Cir.2002) (noting that if a party had been able to show prejudice and/or unfair surprise as a result of his opponent's failure to disclose information pursuant to Rule 26(e)(1), the district court could have properly barred its use at summary judgment); *Klonoski v. Mahlab,* 156 F.3d 255, 268 (1st Cir.1998) (noting that Rule 26(e)(2) "imposes a broad requirement on parties to update their earlier disclosures and discovery responses").

 Even were this not the case, the lack of authority argument would fail. While employment alone does not give an attorney authority to settle on his or her client's behalf (see *Blanton v. Womancare, Inc.,* 38 Cal.3d 396, 404, 212 Cal.Rptr. 151, 696 P.2d 645 (1985)), general agency principles have traditionally been applied to determine whether a lawyer has been vested with express, apparent or ostensible authority to enter into a settlement. See *Murphy v. Padilla,* 42 Cal.App.4th 707, 716–17, 49 Cal.Rptr.2d 722 (1996). There is abundant evidence in the record that the Kumzaks expressly authorized Hunt to act on their behalf, and that he had apparent authority to do so. Evidence in the record reveals that Hunt was in constant communication with Roxana Kuzmak and her daughter regarding the various offers and counteroffers he was making to Inamed's lawyers.[71] The Kuzmaks were not merely reviewing, but in some cases, editing the letters he drafted before they were sent.[72]

---

**71.** See Declaration of Stewart Brown Introducing New Documents In Support of Inamed's Motion for Summary Judgment Pur-

suant to the Parties' Stipulation ("Brown Supp. Decl."), Exs. 1–6.

**72.** *Id.*

Hunt's communications with Inamed referred frequently to conversations with the Kuzmaks and/or their reaction to prior settlement proposals. While the acts of the agent cannot themselves create apparent authority (see *Preis v. American Indemnity Co.*, 220 Cal.App.3d 752, 761, 269 Cal.Rptr. 617 (1990) ("Ostensible authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent")), the Kuzmaks obviously knew that Inamed was negotiating with Hunt as their representative, and permitted that negotiation to go forward with their apparent input and participation.

■ "A principal is liable 'when the principal knows the agent holds himself or herself out as clothed with certain authority and remains silent.'" *NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64, 78, 100 Cal.Rptr.2d 683 (2000) (quoting *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 103, 11 Cal.Rptr.2d 468 (1992)). If the Kuzmaks took the position that Hunt had authority to negotiate, but not to finalize, a settlement on their behalf, they had an affirmative obligation, in the context of the parties' negotiations, to advise Inamed of this fact. See *NORCAL, supra*, 84 Cal.App.4th at 79, 100 Cal. Rptr.2d 683 ("A principal's failure to promptly disaffirm an agent's conduct on her behalf constitutes a ratification"); *Gates v. Bank of America Nat. Trust & Savings Ass'n.*, 120 Cal.App.2d 571, 576–77, 261 P.2d 545 (1953) ("where the rights of third persons depend on his election, the rule is a principal must disaffirm an unauthorized act of his agent within a reasonable time after acquiring knowledge thereof, else his silence may be deemed ratification or acquiescence in order to protect an unsuspecting third party"). Their failure to do so is fatal to Kuzmak's lack of authority defense.

■ Defendants argue that following the California Supreme Court's decision in *Levy v. Superior Court*, 10 Cal.4th 578, 41 Cal.Rptr.2d 878, 896 P.2d 171 (1995), no settlement agreement is valid unless the client participates directly, i.e., signs the contract, him or herself.[73] *Levy* and its progeny—e.g., *Johnson v. Department of Corrections*, 38 Cal.App.4th 1700, 45 Cal. Rptr.2d 740 (1995) and *Murphy, supra*, 42 Cal.App.4th at 715–16, 49 Cal.Rptr.2d 722—have all concerned the proper interpretation to be given to the term "parties" as it is used in California Code of Civil Procedure § 664.6. This statute "create[s] a summary, expedited procedure to enforce settlement agreements when certain requirements that decrease the likelihood of misunderstandings are met." *Levy, supra*, 10 Cal.4th at 585, 41 Cal.Rptr.2d 878, 896 P.2d 171. Each holding was specifically limited to the statutory context in which the case arose, and both *Levy* and *Murphy* expressly recognized the possibility that litigants might seek to enforce settlement agreements by way of separate suits in equity, amendments to pleadings in existing actions or motions for summary judgment. See *Levy, supra*, 10 Cal.4th at 586 n. 5, 41 Cal.Rptr.2d 878, 896 P.2d 171; *Murphy, supra*, 42 Cal.App.4th at 716, 49 Cal.Rptr.2d 722.

Defendants rely on dicta in *Murphy*, which "question[s] whether agency theory can ever be applied in the context of settlement agreements [in] pending litigation in light of the *Levy* and *Johnson* decisions." *Murphy, supra*, 42 Cal.App.4th at 716 n. 7, 49 Cal.Rptr.2d 722. The court "refrain[ed] from ruling specifically on that issue," however, and absent a clearer indication from the California Supreme Court (or at least substantial consensus among the California Courts of Appeal), this court finds no evidence that the Supreme Court will

---

73. See Defs.' Opp. at 10:14–11:14.

ultimately hold that no settlement agreement is enforceable in California unless signed by the client him or herself. The decisions of the Supreme Court and Courts of Appeal to date have focused exclusively on the language of § 664.6; on providing a summary procedure when certain requirements that "decrease the likelihood of misunderstandings" are met, and on the rationale for the statute's enactment. It is true that, in articulating that rationale, the Supreme Court has noted the importance of "litigants' direct participation" in matters related to settlement, so as to ensure that any settlement is the product of their "mature reflection and deliberate assent," and to "impress[ ] upon them the seriousness and finality of the decision to settle...." *Levy, supra,* 10 Cal.4th at 585, 41 Cal.Rptr.2d 878, 896 P.2d 171. These same considerations underlie the policy choice reflected in the Restatement (Third) of the Law Governing Lawyers that the decision whether and on what terms to settle should be reserved to the client. See RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 22(1) (2000). The Restatement specifically recognizes, however, that a client may validly authorize his or her lawyer to make a settlement decision, and further that, under certain circumstances, the opposing party may enforce the resulting settlement agreement against the client. See RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, §§ 22(1), 27 and cmt. a thereto (discussing the fact that a client may vest an attorney with apparent authority to agree to a settlement on his or her behalf, but that to do so, he or she must do more than simply retain the attorney). Outside the context of § 664.6, these policy choices remain valid, and there is no indication that California courts think otherwise. The rule for which defendants argue is simply too broad and too prophylactic.

### 2. Does The January 24, 2000 Letter Agreement Contain All The Essential Terms Of A Contract?

 "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Ladas, supra,* 19 Cal.App.4th at 770, 23 Cal.Rptr.2d 810 (citing *Robinson & Wilson, supra,* 35 Cal. App.3d at 407, 110 Cal.Rptr. 675; *Richards v. Oliver,* 162 Cal.App.2d 548, 561, 328 P.2d 544 (1958); *Ellis v. Klaff,* 96 Cal.App.2d 471, 478, 216 P.2d 15 (1950)). Stated otherwise, the court must be able to determine if there has been a breach of the agreement and award damages.

 If an essential element of the promise is reserved for future agreement, there is no binding contract until the open point is resolved. See *Weddington Productions, Inc. v. Flick,* 60 Cal.App.4th 793, 812, 71 Cal.Rptr.2d 265 (1998) (" '[I]f an essential element is reserved for the future agreement of both parties, as a general rule the promise can give rise to no legal obligation until such future agreement. Since either party in such a case may, by the very terms of the promise, refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise' "); *Okun v. Morton,* 203 Cal.App.3d 805, 817, 250 Cal.Rptr. 220 (1988) ("A contract which leaves an essential element for future agreement of the parties is usually held fatally uncertain and unenforceable"); *Robinson & Wilson, supra,* 35 Cal.App.3d at 409, 110 Cal.Rptr. 675 ("If an essential element of a promise is reserved for future agreement of the parties, the promise does not give rise to a legal obligation until the further agreement is made"). Nonetheless, the defense of uncertainty is disfavored, and the court should enforce an

agreement if it appears the parties intended to enter into a contract and the outlines of the agreement are sufficiently definite that the court knows what is to be enforced. See *Okun, supra,* 203 Cal.App.3d at 817, 250 Cal.Rptr. 220.

Defendants contend the letter agreement lacks several essential terms, and thus that it cannot be enforced as a binding contract.[74] Most fundamentally, they assert, the document contains no release language, despite the fact that the parties were engaged in three separate litigation matters that raised a myriad of claims. Additionally, they argue, the letter did not address such matters as license termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute resolution.

Plaintiffs counter that all terms necessary to form a valid patent license were included in the January 24, 2000, letter. They argue that the letter identifies the licensor and licensee, the subject of the license, its scope and duration, and the royalty payments to be made.[75] See *Core-Vent Corp. v. Implant Innovations, Inc.,* 53 F.3d 1252, 1256–57 (Fed.Cir.1995) (enforcing an oral statement of settlement on the record that "specified in detail the royalties 3–I would pay, and provided that in return for those royalties '[3–I] shall have a non-exclusive worldwide license under Core–Vent's '381 patent, and the foreign counterparts to that patent, namely the patents in Canada, U.K., Japan and Germany,'" the court rejected a contention that the agreement lacked a material term—"that no royalties under Core–Vent's '381 patent would continue to be due if the '381 patent was found to be invalid and/or unenforceable in any subsequent judicial or administrative proceeding'"—stating that defendant should have insisted that such a provision be included as one of the terms stated on the record if it was material to the agreement reached). Additionally, plaintiffs urge, the inclusion of a covenant not to sue in the January 24, 2000, letter agreement was the equivalent of a release of Inamed's invalidity and patent misuse claims for the term of the license, i.e., through the expiration of the '339 patent in 2005.[76]

Defendants assert that *Core–Vent* is not controlling, and that under California law, terms regarding termination, indemnification, and dispute resolution are material to a license agreement. In support, they cite *Weddington Productions, supra,* 60 Cal. App.4th at 815–16, 71 Cal.Rptr.2d 265. They note further that such terms were included in the parties' prior license agreements, and that, given the history of the parties' dealings, terms governing termination of the licenses were of particular significance to Kuzmak.

In *Weddington Productions,* the parties agreed to "formalize a Licensing Agreement" with a "fully paid up license" to Flick. Neither term was defined. *Id.* at 799, 71 Cal.Rptr.2d 265. Thereafter, they began to negotiate the terms of the license, and could not agree on what items within a sound library should be included, what

**74.** Dr. Kuzmak's Memorandum of Points and Authorities in Support of His Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Opp.") at 12–17.

**75.** Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment on the Seventh Count for Specific Performance or Alternatively for Partial Summary Judgment on the Eighth Count For Breach of Settlement Agreement ("Pls.' Mem.") at 11:1–8.

**76.** Reply Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment on the Seventh Count for Specific Performance or Alternatively for Partial Summary Judgment on the Eighth Count For Breach of Settlement Agreement ("Pls.' Reply") at 18:14–19:3.

uses should be permitted, what duties the licensees should have to protect the licensor's interest in the library, whether the licensees should indemnify the licensor, and, if so, under what circumstances; whether the license could be terminated, and if so, on what basis and by what procedure; and whether the parties should arbitrate disputes. *Id.* at 801–02, 71 Cal.Rptr.2d 265. A mediator used the parties' agreement to "formalize a license" as the basis for drafting a thirty-five page settlement order/licensing agreement that included termination, indemnification, and dispute resolution terms. The court held that the license agreement was not enforceable, noting that the parties had not "objectively manifested agreement" to such "material terms." See *id.* at 815–16, 71 Cal.Rptr.2d 265.

 *Core–Vent* and *Weddington Productions* are not in conflict. Rather, they represent the application of two well-settled principles of contract formation. Where parties agree to the material terms of a contract, they cannot avoid the formation of a valid and binding agreement by silently reserving an issue, and later claiming that it was material to their willingness to enter into a contract. See *Core–Vent, supra,* 53 F.3d at 1256 ("If that was Mr. Beaty's understanding of the settlement, he should not have indicated his agreement with the settlement as stated in court, but should have insisted that it include a provision providing for a separate patent licensing agreement and defining its terms. Instead, he accepted the settlement without equivocation.... 'Since contractual obligations are to be ascertained from objective manifestations of intent, plaintiff's mental reservations are legally irrelevant' "). Similarly, where there is no meeting of the minds upon the material terms of a contract, the agreement cannot be enforced. One measure of whether terms are "material" is whether they have been the subject of debate and discussion during the course of the parties' negotiations. See *Weddington Productions, supra,* 60 Cal.App.4th at 808, 71 Cal.Rptr.2d 265 ("While both Weddington and the Flick Parties clearly agreed to the words 'Licensing Agreement' and 'fully paid up license' in the Deal Point Memorandum, the record summarized and highlighted above graphically shows that there was never any meeting of the minds, either subjectively or objectively, as to exactly what these words meant. Hence, as will be apparent from the legal discussion below, there is substantial evidence supporting the proposition that the Deal Point Memorandum did not constitute an enforceable contract"); *id.* at 814, 71 Cal. Rptr.2d 265 ("The purported settlement in the instant case, supposedly memorialized in the Deal Point Memorandum, thus might be enforc[e]able even though all terms of the Licensing Agreement were not expressly stated in the Deal Point Memorandum. However, this could be true only if the parties had objectively manifested a 'meeting of the minds' as to 'all material portions' of the licensing agreement, perhaps by reference to a standardized document, so that their use of the terms 'Licensing Agreement' and 'fully paid-up license' could be found to have a specific, understood and agreed meaning"); *id.* at 818–19, 71 Cal.Rptr.2d 265 ("To the extent that the superior court's judgment may have been based upon a factual finding that the parties had reached an agreement as to license terms, it must be reversed since such a conclusion must be supported by substantial evidence.... [I]t is undisputed that there was no 'writing signed by the parties' setting forth the terms of the licensing agreement.... In addition, the transcripts and other documents filed by the parties show that there was no document of agreed content to which the parties were referring when they used the terms 'Licensing Agreement' and 'fully paid-up license' in the Deal Point

Memorandum. To the contrary, the parties had sharply conflicting ideas of what terms a licensing agreement should contain").

Applying these principles to the instant case, the court looks first to the negotiations that preceded execution of the January 24, 2000, agreement to ascertain the key terms under discussion. Cf. *Frankel v. Board of Dental Examiners,* 46 Cal. App.4th 534, 546, 54 Cal.Rptr.2d 128 (1996) (looking to the "exchange of letters in which the terms of the stipulation were negotiated" to glean the parties' intent). Such a review reflects that items such as license termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute resolution were not mentioned during the course of the negotiations. The terms of the license without such provisions are "sufficiently definite" that a court could determine whether the license had been breached and what an appropriate remedy for the breach would be. See *Ladas, supra,* 19 Cal.App.4th at 770, 23 Cal.Rptr.2d 810. In the words of the *Core–Vent* court, if these items were material to Kuzmak and his attorney, Hunt should not have "indicated his agreement with the settlement" by signing the January 24, 2000 letter and returning it to Chalsen, but should have insisted that it include provisions covering these items. His "mental reservations [on the subjects] are legally irrelevant." *Core–Vent, supra,* 53 F.3d at 1256.

The next item raised by defendants is the lack of any release language in the January 24, 2000, letter agreement. In contrast to matters such as license termination, indemnification, and dispute resolution, Kuzmak's attorney specifically raised the question of a release by Inamed in a November 9, 1999, letter to Inamed's counsel. To understand fully the import of Hunt's November 9 letter, it is necessary to review the history of the parties' negotiations with respect to the scope of the license to be granted by Kuzmak, and Inamed's corresponding requests for a a covenant not to sue. Inamed's first proposal following termination of the parties' license agreements in November 1998 suggested that Kuzmak license it to exploit the '288 and '429 patents, and covenant not to sue it for infringement of the '339 and '868 patents.[77] Following the commencement of litigation, Kuzmak's first settlement proposal contemplated that he would license Inamed to exploit all of his gastric banding patents. On October 14, 1999, Inamed made clear that it had no interest in licensing the '288 and '176 patents, and that it did not wish to license the '429 patent beyond 2005.[78] Kuzmak took issue with this,[79] and further communications on the subject ensued.[80] Ultimately, Kuzmak agreed that the license would extend only to the '339 and '429 patents.[81] At this point—specifically in a letter dated November 9, 1999—Inamed's lawyer once again advised that his client would require a covenant not to sue on the patents excluded from the scope of the licensing agreement.[82]

Kuzmak's attorney responded on November 11, 1999. Noting Inamed's desire to obtain a covenant not to sue, he stated that "Dr. Kuzmak [would] require that Inamed release him from any and all claims of liability and that any filing of a declaratory judgment action or reexamination with respect to any of Dr. Kuzmak's patents by Inamed (or on behalf of In-

---

77. Defs.' Add. Facts, ¶ 7; Pls.' Opp. Facts, ¶ 7.

78. Brown Decl., Ex. 8.

79. *Id.,* Ex. 9.

80. See *id.,* Exs. 10–12.

81. *Id.,* Ex. 13.

82. *Id.,* Ex. 15.

amed) will result in immediate termination of the agreement." He also stated that Kuzmak was not willing to covenant not to sue Inamed for infringement of any patent that issued as a result of his pending Application No. 09/205,195.[83] Inamed answered the following day, asserting that the covenant not to sue had to include all of Kuzmak's patents and pending applications.[84]

The January 24, 2000, letter agreement states that Kuzmak covenants not to sue Inamed on any of his patents and patent applications, pending and future, not included in the license agreement. It contains no release of Kuzmak from claims previously asserted by Inamed, nor any provision stating that Inamed's filing of a declaratory judgment suit or a request for reexamination with the Patent and Trademark Office would result in immediate termination of the license.[85] Finally, it contains no stipulation that the pending litigation proceedings would be dismissed.

■ Inamed contends that the January 24, 2000, letter is the equivalent of a release of Kuzmak, because Inamed could not initiate a suit against Kuzmak seeking a declaration that his patents are invalid because he has covenant not to sue Inamed.[86] In *Amana Refrigeration, Inc., v. Quadlux, Inc.,* 172 F.3d 852 (1999), the Federal Circuit held that a "covenant not to sue for any infringing acts" divests a trial court of jurisdiction over an action seeking a declaration of invalidity and non-infringement because the party in whose favor such a covenant runs has no reasonable apprehension of being sued for infringement. *Id.* at 855 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1060 (Fed.Cir.1995)). Here, be-

cause Kuzmak covenanted not to sue Inamed under any of his patents or patent applications for the term of the license, no declaratory judgment suit could be brought. Thus, Inamed may well be correct that the legal effect of the license and covenant not to sue was to insulate Kuzmak through 2005 from a suit such as Inamed had previously filed against him.

■ The result is less clear with respect to Inamed's claim of patent misuse. Inamed asserts that patent misuse is, in effect, a "defense" that could have not been pursued during the life of the covenant not to sue.[87] It is true, as plaintiffs contend, that patent misuse developed as an equitable defense to an infringement action. See 6 Donald S. Chisum, CHISUM ON PATENTS, § 19.04[4] at pp. 19–534–35 (2001). It is a defense that may be raised by way of an action for declaratory relief. See *B. Braun Medical, Inc. v. Abbott Laboratories,* 124 F.3d 1419, 1428 (Fed.Cir. 1997) (noting that the district court could enter a declaratory judgment that the patent was unenforceable due to misuse). Where patent misuse is found, the district court may, in its discretion, allow the accused infringer to state a damages claim on an antitrust or breach of contract theory. See *Braun, supra,* 124 F.3d at 1428 ("In the present case, if the district court enters a declaratory judgment that the patent is unenforceable due to misuse, it could then exercise its discretion to hold a hearing to allow Abbott to state a substantive claim upon which it is entitled to recover damages"); *Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661, 668 (Fed.Cir.1986) ("The parties thus fail to distinguish between patent misuse as a defensive shield and patent misuse as an offensive sword.

---

**83.** *Id.,* Ex. 17.

**84.** *Id.,* Ex. 18.

**85.** *Id.,* Ex. 23.

**86.** Pls.' Reply at 18:14–25.

**87.** See *id.* at 18:25–19:1.

In both cases, the patentee's act is the same. That act may serve, as here, as a defense to a charge of patent infringement. That act may also serve as an element in a complaint charging antitrust violation"); 6 Donald S. Chisum, CHISUM ON PATENTS, § 19.04[4] at pp. 19–534–35 (2001).

 Here, the precise nature of Inamed's patent misuse claim is difficult to discern. Inamed does not seek merely a declaration that Kuzmak has been guilty of patent misuse. Rather, it seeks to enjoin him permanently from claiming that it has infringed the gastric band patents. This is inconsistent with its assertion as a defense, since a patent misuse defense allows the patent owner to sue for infringement once the misuse has been purged. See *Braun, supra,* 124 F.3d at 1427 ("When used successfully, this defense results in rendering the patent unenforceable until the misuse is purged"). Moreover, the prayer seeks punitive and exemplary damages. As the only damages claims pleaded in the complaint are contract causes of action, which will not support punitive damages, it is possible that Inamed alleges an entitlement to the type of treble damages that may be recovered in connection with an antitrust claim premised on patent misuse. See *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 876–77 (Fed.Cir.1985) (a patentee who brings an infringement suit may be stripped of its exemption under the antitrust laws and "subject to antitrust liability . . . if the alleged infringer (the antitrust plaintiff) proves [among other things] . . . that the infringement suit was 'a mere sham . . .' ").

Additionally, the complaint contains a cause of action that seeks disgorgement of all royalties paid under the 1993 License Agreement, on the basis that Kuzmak breached the representation and warranty in the agreement that he owned the exclusive right to exploit the patents-in-suit. The rationale of *Amana Refrigeration, su-*

*pra,* which concerns the fact that a party that is the recipient of a covenant not to sue has no reasonable apprehension that it will be charged with infringement, does not apply to a claim such as this. See *Amana Refrigeration, supra,* 172 F.3d at 855. The January 24, 2000, letter agreement does not address this claim. Nor does it address the claims Inamed made in the New Jersey state court action it filed when Kuzmak declined to release the clinical data Inamed sought to complete its submission to the FDA. Consequently, the document, at best, incompletely complies with Kuzmak's stated desire for a release on "any and all claims of liability" asserted by Inamed prior to that time.

There is no doubt that release provisions are generally thought to be material terms of any settlement agreement. See, e.g., *Kohn v. Jaymar–Ruby, Inc.,* 23 Cal. App.4th 1530, 1534, 28 Cal.Rptr.2d 780 (1994) ("As outlined above, there was substantial evidence that the parties reached a binding oral agreement at the March 30 settlement conference as to the material terms of a settlement—amount of payment, scope of release, confidentiality— and that all that remained to be done was a reduction of the agreement to a writing"). See also *Doi v. Halekulani Corp.,* 276 F.3d 1131, 1138 (9th Cir.2002) (referencing dismissal of the case with prejudice and a release as among the material terms of a settlement agreement placed on the record); *Abbott Laboratories v. Alpha Therapeutic Corp.,* 164 F.3d 385, 388 (7th Cir.1999) (noting that "the details of . . . release provisions . . . in settlement agreements are inherently material"). Here, one need not guess as the matter, since Inamed made clear that it required a covenant not to sue on patents not included within the scope of the license, and Kuzmak made clear that he required a release of "any and all claims of liability." Releases, or their equivalents, therefore, were expressly made material by the parties,

and were not covered in the January 24, 2000, letter agreement.

Additionally, the agreement contains no language regarding dismissal of the pending lawsuits. Inamed argues this was "implied," as the Re: line identifies each of the actions, and the letter confirms the "settlement agreement reached ... in the above-referenced actions."[88] While this may be true, an important and material detail is missing—whether the dismissal was to be *with* prejudice or *without*. This issue is, of course, linked directly to the nature of the release contemplated by the parties, as a dismissal *with* prejudice would have precluded Inamed and Kuzmak from refiling their respective claims, while a dismissal *without* prejudice would have permitted reassertion of the claims at some point in the future.

Inamed asserts that "[t]he negotiations between the parties make clear that a dismissal with prejudice of all claims was intended except with respect to claims regarding the '429 patent, which would be dismissed without prejudice."[89] Having reviewed the parties' correspondence, the court is unclear how this intent can be gleaned from the exchange of letters. In-amed may mean to suggest that the parties' agreement to negotiate an extension of the license for the '429 patent in 2005 "in light of the future state of the art" implies that it was free, at that time, to challenge the validity of the patent. It appears, however, that it was also free to challenge the validity of the '288 patent, the '868 patent, the One–Size–Fits–All patent, assuming it had issued, the reissued '176 patent, and any foreign patent as well, since the covenant not to sue on these patents was to expire with the license agreement in 2005. Indeed, this is precisely what Inamed argues at a later point in its brief.[90] Moreover, the statement of Kuzmak's attorney in his November 11, 1999, letter that "any filing of a declaratory judgment action or reexamination with respect to any of Dr. Kuzmak's patents by Inamed (or on behalf of Inamed) will result in immediate termination of the agreement" suggests that he, too, may have understood that any dismissal of the invalidity and unenforceability claims would be without prejudice. In short, here too, a term essential to the enforcement of a contract purporting to settle three pieces of litigation is absent from the January 24, 2000, letter agreement.[91]

---

88. Pls.' Reply at 18:4–7.

89. *Id.* at 18:1–3.

90. See *id.* at 18:18–21 ("Accordingly, *during that period* [the life of the covenant not to sue], Inamed could not as a matter of law seek a declaratory judgment that the Kuzmak patents are invalid because Inamed would not have any reasonable apprehension of an infringement suit").

91. Inamed's counsel argued at the hearing that the reference in Inamed's brief to dismissal with prejudice of all claims except those regarding the '429 patent meant that claims regarding the '339 patent were to be dismissed with prejudice, while claims under all other patents were to be dismissed without prejudice. (See Reporter's Transcript ("RT") at 15–16.) She indicated that the brief referenced the '429 patent because that is the only patent that Inamed believes could possibly cover its Lap Band product. (*Id.*) The lawyer representing Inamed in the negotiations leading up to execution of the January 24, 2000, letter agreement testified that he could remember no discussion as to whether the pending litigation matters would be dismissed with or without prejudice. (Chalsen Depo. at 125:11–17.) Similarly, he testified that he did not recall using the word "release" in discussions with Kuzmak's counsel prior to January 24, 2000. (*Id.* at 90:17–91:5, 91:21–93:10. See also Defs.' Add. Facts, ¶ 24; Pls.' Opp. Facts, ¶ 24 (acknowledging that parties did not discuss releases during negotiation of the January 24, 2000, letter agreement)). At the hearing, Inamed's attorney argued that the parties "intended to release the claims that

Events that transpired subsequent to execution of the January 24, 2000, agreement reinforce the view that the parties failed to reach agreement on the nature of the releases that would be given and on the manner in which the pending lawsuits would be resolved. On February 16, 2000, Inamed forwarded to Kuzmak's lawyer a draft settlement agreement that allegedly embodied the agreed-upon terms. This document contained a unilateral release running in Inamed's favor of all claims that Kuzmak had asserted, or could have asserted, to that date, including claims under the 1993 License Agreement. A release running in favor of Inamed, of course, was a subject that had, at no time, been raised during the parties' negotiations.

The draft contained no release of Kuzmak, except to the extent that the covenant not to sue granted by Kuzmak had the effect of preventing suit against him for a period of time on the patents within its scope.[92] Contrary to the terms of the January 24, 2000, letter agreement, the covenant not to sue was expanded to include the '429 patent following expiration of the license in 2005. Contrary to the understanding of Kuzmak's attorney and the substance of some of the parties' pre-January 24, 2000 correspondence, the covenant not to sue continued beyond the expiration of Inamed's license of the '339 patent in 2005. Dismissal of the three lawsuits was contemplated, although the record before the court does not reflect whether the dismissal was to be with prejudice or without.

Kuzmak's lawyer reacted to the proposed draft on March 29, 2000, noting, *inter alia*, that the covenant not to sue was "clearly" not intended to extend beyond termination of the license agreement, and that, because there was a possibility of future litigation between the parties, his client could not agree to the sweeping release language Inamed had proposed.[93]

An agreement must be sufficiently definite that a court can determine the parties' respective duties and whether they have been breached. Here, while the license agreement portion of the parties' contract

were put on the table by the [pending] lawsuits except ... for the carve out" created by the covenant not to sue. As evidence of this, she pointed to the "Re" line on the letter. (*Id.* at 15.) The effect of Kuzmak's covenant not to sue Inamed for infringement of his various patents was to preclude any declaratory relief suit against him by Inamed asserting invalidity or non-infringement. See *Amana Refrigeration, supra,* 172 F.3d at 855 ("Quadlux's promise not to assert any infringement claim against Amana under the patent as it presently reads, with respect to any product previously or currently advertised, manufactured, marketed, or sold by Amana, removed any reasonable apprehension that Amana will face an infringement suit based on its activities before the filing date"); *Super Sack Mfg. Corp., supra,* 57 F.3d at 1060 ("The residual possibility of a future infringement suit based on [the alleged infringer's] future acts is simply too speculative a basis for jurisdiction over [the alleged infringer's] counterclaim for declaratory judgments of invalidity"). Thus, the most reasonable interpretation of the "carve out" reflected in the January 24, 2000, agreement, as respects claims asserted by Inamed, is that it was meant to apply only to Inamed's claims of patent invalidity and non-infringement, not to all claims asserted in this and the New Jersey state court action. Such an interpretation would run contrary to Kuzmak's assertion during negotiations that he wanted a release "of any and all claims," a statement that is itself ambiguous given his subsequent reference to Inamed's filing of a declaratory judgment action or request for reexamination. (See Brown Decl., Ex. 17.) Given the fact that the parties did not specifically discuss the scope of the releases to be given, and given the ambiguity surrounding the meaning of the covenant not to sue, the contract is not "sufficiently definite" as respects the parties' intentions with respect to future litigation and future assertion of claims to permit enforcement.

92. Brown Decl., Ex. 26.

93. *Id.,* Ex. 28.

is sufficiently definite, in the court's view, to permit enforcement, the substance of their agreement regarding pending litigation and releases is not. Were the court to attempt to enforce the agreement at this point, it would not know which claims to dismiss with prejudice—such that they could not be brought again in the future—and which to dismiss without prejudice. It would not know whether to imply a broad release running in Inamed's favor, a narrow one, or none at all. It would similarly not know whether any release of Kuzmak should be limited to the temporal and substantive parameters of the covenant not to sue, such that Inamed could assert its pending invalidity claims again in 2005 (at least as to patents other than the '339, which will have expired), or whether claims under all patents except the '429 should be deemed released for all time. Finally, it would not know whether to release Kuzmak on Inamed's royalty disgorgement and patent misuse claims, and if so, whether to dismiss those claims with or without prejudice. Because the letter agreement is missing these essential terms, it is not sufficiently definite to be enforced by the court, or to support an action for breach.[94] See *Defalco v. Oak Lawn Public Library*, No. 99 CV 02137, 2000 WL 263922, * 4 (N.D.Ill. Mar. 1, 2000) (refusing to enforce an oral settlement agreement because the scope of the release contemplated was not clear, the court stated: "Although general releases are common, there is not necessarily any ordinary linguistic meaning to the terms 'giving up your claims, your lawsuits' that would have alerted DeFalco that a state law claim separate from his federal law claims would also be included in the release. Furthermore, there is no term of art meaning, and the behavior of the parties does not indicate a shared meaning of 'release.' Without a common meaning of 'release' this court finds that there was no meeting of the minds with regard to the release provision"); *Bontigao v. Villanova University*, 786 F.Supp. 513, 515 (E.D.Pa.) (in a employment discrimination case where the parties entered into an oral settlement agreement, the employer's counsel prepared a proposed settlement agreement that included a general release, and the employee's counsel countered with a narrow release limited to the case at hand, the court refused to enforce the oral agreement, holding that the parties had not reached agreement on all material terms of the settlement), aff'd., 980 F.2d 722 (3d Cir.1992); *M & D Balloons, Inc. v. Courtaulds, PLC*, No. 90 C 834, 1990 WL 186077, *3 (N.D.Ill. Nov. 21, 1990) (declining to enforce a settlement that incorporated a manufacturing license agreement after a dispute arose as to whether plaintiff was required to drop its

---

**94.** Inamed argues that the terms the court would have to imply in the instant case are no more material than those implied by the district court in *Core–Vent*. (RT at 12.) There, the court implied a term that limited the parties' license agreement to products then being manufactured by the defendant as opposed to products it might manufacture and sell in the future. *Core–Vent, supra*, 53 F.3d at 1258. It also determined that the obligation to pay royalties commenced on the day settlement was reached, December 14, 1993, as opposed to the start of calendar year 1994. *Id.* at 1259. Finally, it determined that defendant was obligated to pay interest on the amount it had agreed to pay for past infringe-ment from the date of final judgment. *Id.* As respects each of these terms, the district court was guided by clear indications of the parties' intent in the agreement that had been stated on the record and/or by common sense interpretation of the agreement stated. See *id.* at 1258–59. Here, the court is confronted with a situation in which the parties' January 24, 2000, letter agreement provides no clear indication of their intent with respect to the scope of the releases to be given or the nature of the dismissals to be entered in light of the releases. The case is thus distinct from *Core–Vent*, where all material terms necessary to an enforceable agreement were stated.

breach of contract claims in the pending suit, the court stated: " ... all parties agree that the defendants sent the plaintiff a letter offering in essence an exclusive manufacturing license covering the Western Region of the United States and a non-exclusive selling license in exchange for $425,000, spread out over a three-year period. M & D then prepared a draft license. Apparently dissatisfied with M & D's draft, the defendants submitted an alternative draft license. This draft provided that the entering of the license effects a settlement of all claims under the Letter of Intent, including the manufacture of taps and glands. In the motion before this Court it is clear that the plaintiff has not withdrawn its claims under the Letter of Intent and does not intend to. As the defendants point out, a settlement that leaves the underlying claims intact is not much of a settlement. Here, we find no meeting of the minds concerning the settlement agreement. In addition, there are a number of counter offers, but no acceptance. Accordingly, this court adopts the magistrate's recommendation that M & D's motion for enforcement of the settlement agreement be denied"). See also *Chappell v. Roth,* 353 N.C. 690, 692–93, 548 S.E.2d 499 (N.C.2001) (" ... we hold that, absent agreement by the parties concerning the terms of the release, the settlement agreement did not constitute an enforceable contract.... [G]iven the consensual nature of any settlement, a court cannot compel compliance with terms not agreed upon or expressed by the parties in the settlement agreement. Plaintiff contends that the settlement agreement is enforceable as to those terms upon which the parties reached agreement, namely defendants' payment of $20,000 to plaintiff in exchange for a voluntary dismissal with prejudice. We disagree. In the present case the mediated settlement agreement provided that defendants would pay $20,000 to plaintiff in exchange for a volun-tary dismissal with prejudice and a 'full and complete release, mutually agreeable to both parties.' The 'mutually agreeable' release was part of the consideration, and hence, material to the settlement agreement. The parties failed to agree as to the terms of the release, and the settlement agreement did not establish a method by which to settle the terms of the release. Thus, no meeting of the minds occurred between the parties as to a material term; and the settlement agreement did not constitute a valid, enforceable contract"). Cf. *Thompson v. United States Department of Labor,* 885 F.2d 551, 556–57 (9th Cir.1989) (holding that Secretary of Labor, who approved a settlement of a federal employee's administrative discrimination claim, acted arbitrarily and capriciously by directing that his complaint be dismissed with prejudice, because the "the settlement agreement [was] silent as to any dismissal of the claims, either with or without prejudice," and "[t]he Secretary's dismissal with prejudice added a material condition to the parties' agreement"); *Eaton v. Marion County Fair Ass'n,* 172 F.Supp.2d 1184, 1187 (S.D.Iowa 2001) ("The Settlement Agreement that the MCFA would have this Court use to bar Mr. Eaton's claims simply states 'Mutual Release.' Typically, a mutual release outlines the possible claims, parties, and time period to which such a mutual release might apply. A mutual release may, in fact, release the parties and anyone in any way related to them from any conceivable claims against each other for all time up to the date of the agreement, but lawyers will typically draft mutual releases that actually say that, rather than simply recite the magic words, 'Mutual Release.' Does the term in the Agreement, 'Mutual Release' apply to all conceivable claims, or simply claims related to the injunction and not the court order to seize merchandise or the MFCA's trademark claims? Does the

Agreement apply to claims arising for all time past, or simply the events of August, 2000? The Agreement is far too vague to answer these questions on its face...").

Because the parties failed to agree upon material terms regarding the dismissal of pending litigation and the scope of the releases to be given, the January 24, 2000, letter agreement is not enforceable, and plaintiffs cannot prevail on their seventh and eighth causes of action.[95]

### C. Even If The Letter Agreement Were Enforceable, Inamed Cannot Prove An Essential Element Of Its Claims For Specific Performance And Breach Of Contract

■ Inamed's motion seeks summary judgment on its breach of contract and specific performance claims. Assuming *arguendo* that the January 24 2000, letter agreement is an enforceable contract, proving that Kuzmak breached his obligations under the agreement is an essential element of Inamed's claims. See *Spear v. California State Automobile Ass'n.*, 2 Cal.4th 1035, 1042, 9 Cal.Rptr.2d 381, 831 P.2d 821 (1992) ("This conclusion is also compelled by an examination of when a party to a contract is permitted to bring an action on the contract. As noted above, an action to compel arbitration is in essence a suit to compel specific performance of a contractual term, i.e., the arbitration agreement.... A contract cause of action does not accrue until the contract has been breached"); *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968) (the essential elements of a breach of contract action are "(1) the contract, (2) plaintiff's perform-

ance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff"); *First Commercial Mortgage Co. v. Reece*, 89 Cal.App.4th 731, 745, 108 Cal.Rptr.2d 23 (2001) ("Turning to the breach of contract claim, the elements of the cause of action are the existence of the contract, performance by the plaintiff or excuse for nonperformance, breach by the defendant and damages"); *Golden West Baseball Co. v. City of Anaheim*, 25 Cal.App.4th 11, 49, 31 Cal.Rptr.2d 378 (1994) (holding that plaintiff was not entitled to specific performance because "there was no breach on which to predicate it," the court stated that "... specific performance is a remedy for breach of contract, a cause of action which requires proof the contract was breached").

■ Breach can be either actual or anticipatory. An anticipatory breach occurs when a party expressly and unequivocally refuses to perform, or when its conduct places the party in a position where it cannot substantially perform. *Taylor v. Johnston*, 15 Cal.3d 130, 137, 123 Cal.Rptr. 641, 539 P.2d 425 (1975) ("Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract. The repudiation may be express or implied. An express repudiation is a clear, positive, unequivocal refusal to perform ...; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible"); *Martinez v. Scott Specialty Gases, Inc.*, 83 Cal.App.4th 1236, 1246, 100 Cal. Rptr.2d 403 (2000) (quoting *Taylor*); *County of Solano v. Vallejo Redevelop-*

---

**95.** Because the court concludes that the agreement lacks essential terms, it need not address the parties' remaining arguments regarding intent to be bound and consideration. The court notes, however, that with regard to

the parties' intention to treat the January 24, 2000, letter agreement, there is a clear conflict in the evidence that would preclude the entry of summary judgment in either party's favor.

*ment Agency,* 75 Cal.App.4th 1262, 1276, 90 Cal.Rptr.2d 41 (1999) (same).

When a promisor repudiates a contract, the promisee "may treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he ... can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his ... remedies for actual breach if a breach does in fact occur at such time." *Romano v. Rockwell International, Inc.,* 14 Cal.4th 479, 489, 59 Cal.

Rptr.2d 20, 926 P.2d 1114 (1996) (quoting *Taylor, supra,* 15 Cal.3d at 137, 123 Cal. Rptr. 641, 539 P.2d 425). See also *Am-Cal Inv. Co. v. Sharlyn Estates, Inc.,* 255 Cal.App.2d 526, 539, 63 Cal.Rptr. 518 (1967) (noting that specific performance is a proper remedy for anticipatory breach/repudiation just as it is for actual breach, so long as all other requirements for granting specific performance are met).

At the hearing on this motion, Inamed identified Kuzmak's March 29, 2000, letter, as the repudiation or breach giving rise to its causes of action.[96] As requested by Inamed, Kuzmak's lawyer outlined in this

---

**96.** In its opening brief, Inamed asserted that "Kuzmak ... failed to perform under the terms of the January 24, 2000 Letter Agreement" by "refus[ing] to complete the further document." (Pls.' Mem. at 20:18–21.) In reply, it urged that Kuzmak "failed to perform his obligation to use best efforts to sign off on the more formal documents by manufacturing 'disputes' regarding terms that had already been resolved ..., inserting vastly different terms ... in the March 29, 2000 letter ..., and shopping the deal with Inamed to Obtech, a German competitor of Inamed...." (Pls.' Reply at 23, n. 12.) With the exception of the alleged third-party negotiations, the reply brief appears to reference the March 29, 2000, letter as the repudiation/breach. Moreover, as explained by its counsel at oral argument, Inamed concluded that "Kuzmak ... refused to complete" a more formal settlement agreement after it received the March 29, 2000, letter from Hunt. Thus, the opening brief also appears consistent with counsel's representation at the hearing. The additional assertion that Kuzmak repudiated or breached the January 24, 2000, letter agreement by negotiating with a third party after the document had been executed is not supported by the record. The deposition excerpts cited by Inamed in support of this contention reflect that Kuzmak was in negotiations with Obtech prior to January 24, 2000, that he advised Obtech of the execution of the January 24, 2000, letter, and that, as of May 19, 2000, his attorney and Obtech were communicating with one another. (Brown Reply Decl., Ex. 2 ("Hunt Depo.") at 21:19–25:6; 258:3–263:2.) The May 19, 2000, communication asked for Obtech's "thoughts regarding matching the

agreement in principle" with Inamed and "reaching an agreement where the Kuzmaks would get their money sooner than proposed." (*Id.,* Ex. 136.) It also noted that Kuzmak "might be willing to consider simply selling the patents to [Obtech] outright...." (*Id.*) Inamed, of course, had filed suit against Kuzmak in New Jersey district court the prior month, on April 5, 2000. Thus, events that occurred after that date do not evidence repudiation. Indeed, the May 19, 2000, letter to Obtech notes that "Inamed ha[d] recently sued the Kuzmaks on the patents in New Jersey...," and that "there appear[ed] to be a dispute between the parties as to some aspects of the agreement" in principle that had been reached with Inamed in January. (*Id.*) Moreover, the letter itself evidences no commitment by Kuzmak to enter into an agreement with Obtech, and thus to place himself in a position where it would have been impossible for him to perform his obligations under the January 24, 2000, letter agreement. The entire tone of the letter is tentative and preliminary, and is consistent with Hunt's testimony that Kuzmak had not agreed to accept Obtech's "meet or exceed" offer, but only to ensure that Obtech was "informed what [Inamed's offer] was." (*Id.* at 262:14–15.). There is, additionally, no evidence that Kuzmak was negotiating with Obtech at any time after January 24, 2000, and prior to May 2000, or that any agreements had been reached between them. For these reasons, the May 19, 2000, communication cannot be said to constitute a clear and unequivocal repudiation of the January 24, 2000, letter agreement.

letter the inconsistencies he saw between the February 16, 2000, draft settlement agreement and the January 24, 2000 letter.[97] Inamed asserts that the reference in the letter to a 3% royalty—rather than the $36 per band royalty specified in the January 24, 2000, letter agreement—constituted a repudiation because the royalty amount "was the deal."[98] The letter identified the royalty amount as "a problem area," and noted that the parties had agreed to a 3% royalty that had been "imperfectly stated" in the draft settlement agreement as $36 per band.[99] It identified the following other "problems" or "concerns" with the February 16, 2000, draft agreement as well: (1) that the covenant not to sue on the '429 and other Kuzmak patents extended beyond expiration of the term of the '339 patent; (2) that the release of Inamed included in the draft agreement was too expansive; (3) that the agreement stated the advance royalty payment was to be "non-refundable" once paid instead of "non-refundable, irrevocable and uncontestable,"; (4) that Inamed's obligation to pay the advance royalty ceased upon a judgment of invalidity or unenforceability; and (5) that the agreement appeared to require that no royalties be paid on bands made in the United States, but sold outside the country for importation and implantation in the United States.[100]

Kuzmak's lawyer suggested that, "[g]iven the problems, including future uncertainties inherent in the agreement in principle and problems of trust regarding payment of royalties, some thought … be given to an agreement structure wherein, for a large, up front, lump sum payment,

Dr. Kuzmak would assign all his rights in the Kuzmak patents to Inamed."[101]

■ The party asserting repudiation bears "a heavy burden, for anticipatory breach must appear only with the clearest terms of repudiation of the obligation of the contract…." *Martinez, supra,* 83 Cal. App.4th at 1246, 100 Cal.Rptr.2d 403 (quoting *Guerrieri v. Severini,* 51 Cal.2d 12, 18, 330 P.2d 635 (1958) (internal quotations omitted)). As a matter of law, the March 29, 2000 letter is not sufficiently clear or unequivocal to constitute a repudiation. It speaks of "problem areas," suggests that "thought might be given" to restructuring the agreement, and concludes with the statement, "We look forward to hearing from you." Nowhere in the letter does Kuzmak's counsel state that his client will not settle the dispute on the terms outlined in the January 24, 2000, letter agreement, or that Kuzmak refuses to continue negotiations regarding a formal settlement agreement.[102] See *Taylor, supra,* 15 Cal.3d at 138, 123 Cal.Rptr. 641, 539 P.2d 425 ("There is no evidence in the record that defendants or their agents Dr. Pessin and Mrs. Judy ever stated that Sunday Slippers and Sandy Fork would not be serviced by Fleet Nasrullah during the 1966 breeding season or that they ever refused to perform. Frazier, plaintiff's agent who made arrangements for the breeding of the mares admitted that they had never made such a statement to him. Accordingly, there was no express repudiation or unequivocal refusal to perform"); *Whitney Inv. Co. v. Westview Development Co.,* 273 Cal.App.2d 594, 602–03, 78 Cal.Rptr. 302 (1969) (a letter was not a repudiation or a refusal to perform simply

**97.** Bamberger Decl., Ex. 6.

**98.** RT at 48.

**99.** Bamberger Decl., Ex. 6.

**100.** *Id.*

**101.** *Id.*

**102.** See Chalsen Depo. at 61:22–62:17, 65:9–18, 66:5–76:9.

because it requested a delay in performance, as it reaffirmed the party's understanding of agreed-upon deadlines and the need to "get to work," and stated: "Let us get together to discuss and agree on a workable schedule for all of the aforementioned points"). To the extent the letter misstates the terms of the parties' agreement regarding the royalty to be paid, it is equivalent to Inamed's February 16, 2000, settlement draft, which significantly expanded the scope of the covenant not to sue beyond what was reflected in the January 24, 2000, letter agreement. Inamed asserts vehemently that its preparation and submission of a "non-conforming" settlement draft did not constitute a repudiation of the agreement.[103] For similar reasons, Hunt's misstatement of the royalty term did not either. At most, the letter was an indication that Kuzmak would reject the January 24, 2000, letter agreement if the parties' disputes could not be resolved. It was not a repudiation. See

---

**103.** In assessing whether a party has repudiated an earlier oral agreement or letter of intent by submitting a non-conforming draft contract to the other party for signature, at least some courts examine whether the non-conforming term included in the draft concerns one of the substantive terms of the agreement or is merely a stylistic matter. In *Taylor v. Gordon Flesch Co., Inc.*, 793 F.2d 858 (7th Cir.1986), the court rejected a contention that changes to a settlement draft constituted a repudiation of the parties' oral agreement. The bulk of the changes were grammatical and stylistic, and the court concluded that the only substantive change was immaterial as it concerned a release of claims that the objecting party conceded he could not assert. *Id.* at 864. Under these circumstances, the court held that there had been no "unequivocal declaration" of the type required to support a finding of repudiation. *Id.* See also *Varga v. Baker*, No. 92–5064, 1993 WL 20073, * 1 (D.C.Cir. Jan. 5, 1993) ("The changes made by the State Department were stylistic, and did not modify the substance of the agreement. Thus, the fact that the exact language of the written settlement agreement had not been finalized does not demonstrate that the parties did not intend to be bound by their agreement"). Compare *Mahboob v. Department of Navy*, 928 F.2d 1126, 1129 (Fed.Cir.1991) ("The most convincing evidence that the telephone conference was not a final settlement of plaintiff's case, and that a written settlement document signed by both parties was required, was the fact that on August 1, 1989, (seven days after the conference was held) the Navy's attorney Jacobson prepared such a written settlement agreement, signed it, and sent it to the plaintiff for her consideration and signature.... The writing of the Navy's proposed settlement agreement by Jacobson is significant because it indicates that the Navy, like the plaintiff, did not consider the telephone conference a final settlement of plaintiff's case. Jacobson's written proposal was also significant because of its contents. It contained various new terms of settlement that were not even mentioned in the telephone conference"). In the last analysis, neither Inamed's draft settlement agreement, nor Hunt's March 29, 2000, letter were sufficiently clear and unequivocal to constitute a repudiation. See *Inwood International Co. v. Wal–Mart Stores, Inc.*, 243 F.3d 567, 2000 WL 1720676, * 5 n. 4 (Fed. Cir.2000) (Unpub.Disp.) ("Inwood asserts ... that the post-mediation correspondence between the parties constitutes a repudiation or anticipatory breach of the Settlement Agreement. However, an anticipatory breach occurs only when a party makes a clear and unequivocal statement of his intention to break the contract when his performance comes due—a statement 'sufficiently positive to be reasonably understood as meaning that the breach will actually occur.' ... [T]here can be no breach of the Settlement Agreement where the post-mediation offers or counteroffers regarding the mutual releases and formal documents did not manifest either part[y's] intent to breach the dismissal of the claims of the infringement suit, i.e., to substantially perform under the contract"); *Deren v. Digital Equipment Corp.*, 61 F.3d 1, 3 n. 2 (1st Cir.1995) (noting that plaintiffs' "post-settlement requests for information" regarding a severance package they had been denied were "far too vague to be read as a claimed repudiation of the releases" they had signed because the requests were not "unambiguous statement[s] of intent to disavow the[ ] agreement").

*Gold Mining & Water Co. v. Swinerton*, 23 Cal.2d 19, 28, 142 P.2d 22 (1943) ("... it has been held that a mere threat alone to abandon is not a repudiation..."). See also *Taylor, supra*, 15 Cal.3d at 140, 123 Cal.Rptr. 641, 539 P.2d 425 ("'A mere declaration ... of a party of an intention not to be bound will not of itself amount to a breach, so as to create an effectual renunciation of the contract,'" quoting *Atkinson v. District Bond Co.*, 5 Cal.App.2d 738, 743, 43 P.2d 867 (1935)).

Inamed has also presented no evidence that Kuzmak refused to perform a duty under the purported contract, or that he engaged in conduct that made it impossible for him to perform his obligations under the January 24, 2000, letter agreement. See *Taylor, supra*, 15 Cal.3d at 139, 123 Cal.Rptr. 641, 539 P.2d 425 ("...there is no implied repudiation, i.e., by conduct equivalent to unequivocal refusal to perform, unless 'the promisor puts it out of his power to perform'"); *id.* at 140, 123 Cal.Rptr. 641, 539 P.2d 425 (rejecting the assertion that "giving [plaintiff] the runaround" and conduct suggesting that defendants "had no intention of performing their contract" constituted an implied repudiation, the court stated: "Plaintiff has not presented ... any authority in California in support of his proposition that conduct which has not met the test for an implied repudiation, i.e. conduct which

removed the power to perform, may nonetheless be held to amount to the equivalent of an express repudiation and thus constitute an anticipatory breach"). Here, the March 29, 2000 letter cannot have constituted an implied repudiation, as Kuzmak took no steps to make his own performance under the January 24, 2000, letter agreement impossible. Compare *Bomberger v. McKelvey*, 35 Cal.2d 607, 613, 220 P.2d 729 (1950) (defendant who refused to allow plaintiffs onto land, pursuant to the parties' contract, to demolish a building repudiated the contract); *McWilliams v. Holton*, 248 Cal.App.2d 447, 451–52, 56 Cal.Rptr. 574 (1967) (giving written notice to plaintiff of the cancellation of a lease agreement completed defendant's repudiation of the lease, and constituted an anticipatory breach of the contract because it made it impossible for plaintiff to take possession of the premises); *Southern Christian Leadership Conference of Greater Los Angeles v. Al Malaikah Auditorium Co.*, 230 Cal.App.3d 207, 223, 281 Cal.Rptr. 216 (1991) (where a concert hall returned a concert promoter's deposit and rented the hall to someone else, it repudiated the parties' option contract, and the promoter could maintain an action for breach); *Johnson v. Meyer*, 209 Cal.App.2d 736, 741–42, 26 Cal.Rptr. 157 (1962) (where defendants gave an option to a third party after plaintiff had accepted their offer, "they effectively placed themselves in a position of being unable to perform their agreement").[104]

---

**104.** Kuzmak's assignment of the patents to Ethicon might have constituted an anticipatory breach, but for the fact that it occurred long after Inamed filed suit in New Jersey, alleging breach of contract, and seeking damages as well as specific performance. Inamed also reasserted its claims of patent invalidity, patent misuse, and breach of the parties' license agreement in that suit, claims that Inamed contends were to have been dismissed pursuant to the January 24, 2000, letter agreement. (See Chalsen Depo., Ex. 21.) Kuzmak was thus entitled to treat the filing of the action as an indication that Inamed considered the contract terminated. See *Taylor,*

*supra,* 15 Cal.3d at 137, 123 Cal.Rptr. 641, 539 P.2d 425 ("When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time"). See also *Monolith Portland Cement Co. v. Douglas Oil Co. of California*, 303 F.2d 176, 181 (9th Cir.1962) (affirming the

Because there is no evidence that Kuzmak repudiated or actually breached the agreement Inamed seeks to enforce, Inamed cannot assert claims for breach of contract or specific performance, and its motion for summary judgment on the seventh and eighth causes of action must be denied.

### D. Whether Summary Judgment Is Properly Entered In Defendants' Favor

 The district court may *sua sponte* grant a summary judgment to the nonmoving party where it determines that "there is no genuine dispute respecting a material fact essential to the proof of movant's case...." *O'Keefe v. Van Boening*, 82 F.3d 322, 324 (9th Cir.1996) (quoting *Cool Fuel v. Connett*, 685 F.2d 309, 311 (9th Cir.1982) (internal quotations omitted)). See also *Kassbaum v. Steppenwolf Productions, Inc.*, 236 F.3d 487, 494 (9th Cir.2000) ("It is generally recognized that a court has the power *sua sponte* to grant summary judgment to a non-movant when there has been a motion but no cross-motion"); *Portsmouth Square, Inc. v. Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir.1985) ("Under certain limited circumstances a district court may issue summary judgment on its own motion. For example, *sua sponte* summary judgment is appropriate where one party moves for summary judgment and, after the hearing, it appears from all the evidence presented that there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law").

 "[A] litigant must be given reasonable notice that the sufficiency of his or her claim will be in issue...," however, before summary judgment can properly be entered. *O'Keefe, supra,* 82 F.3d at 324. See also *Kassbaum, supra,* 236 F.3d at 494 (" 'great care must be exercised to assure that the original movant has had an adequate opportunity to show that there is a genuine issue and that his [or her] opponent is not entitled to judgment as a matter of law,' " quoting *Ramsey v. Coughlin,* 94 F.3d 71, 74 (2d Cir.1996)). "Reasonable notice" requires "adequate time to develop the facts on which the litigant will depend to oppose summary judgment." *Id.* (quoting *Portsmouth Square, supra,* 770 F.2d at 869).

 Here, the parties' correspondence preceding, and the terms of, the January 24, 2000, letter agreement are not in dispute. Whether the essential terms of the agreement are sufficiently definite and certain that the contract is enforceable is a question of law for the court to decide. It is clear, moreover, that plaintiffs have had adequate time to develop the facts pertinent to the motion. The parties have taken extensive discovery, and the matter has been exhaustively briefed. In their opposition memorandum, defendants requested that the court enter summary judgment in their favor because the issue was one of law. For all these reasons, the court concludes that Inamed was on notice of the possibility that this motion might result in the entry of summary judgment in defendants' favor. *Sua sponte* entry of judgment in defendants' favor on the seventh and eighth causes of action in plaintiffs' complaint is thus appropriate.

district court's finding that defendant's repudiation of a contract for the sale of oil was not accepted until plaintiff filed suit); *Kinesoft Development Corp. v. Softbank Holdings Inc.,* 139 F.Supp.2d 869, 897 (N.D.Ill.2001) (noting that a party can give notice that it considers a repudiation final by filing suit); *Principal*

*Mut. Ins. Co. v. Toranto,* No. 3:95–CV–2841–R, 1997 WL 279751, * 2 (N.D.Tex. May 15, 1997) ("A suit for damages for breach of contract, as opposed to a suit for specific performance, suffices to demonstrate acceptance of the breach by the nonbreaching party").

### III. CONCLUSION

For the above reasons, the court denies plaintiffs' motion for summary judgment and enters partial summary judgment *sua sponte* in defendants' favor on the seventh and eighth causes of action in plaintiffs' complaint.